**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**AMY BADEN-WINTERWOOD,**

                **Plaintiff,**                             **Case No. 2:06-cv-99**
                                                      **JUDGE GREGORY L. FROST**
      **v.**                                        **Magistrate Judge Mark R. Abel**

**LIFE TIME FITNESS,**

                **Defendant.**

**OPINION AND ORDER**

This matter is before the Court for consideration of the following filings:

(1) a motion for summary judgment (Doc. # 57) filed by Defendant Life Time Fitness ("Defendant"), a memorandum in opposition (Doc. # 72) filed by Plaintiff Amy Baden-Winterwood, individually, and on behalf of others similarly situated ("Plaintiffs"), and a reply (Doc. # 73); and

(2) a motion for partial summary judgment (Doc. # 62) filed by Plaintiffs, Defendant's memorandum in opposition (Doc. # 71), and a reply (Doc. # 74).

For the reasons that follow, the Court **GRANTS** in part and **DENIES** in part Defendant's motion (Doc. # 57) and **GRANTS** in part and **DENIES** in part Plaintiffs' motion (Doc. # 62).

**I. Background**

The parties have jointly submitted the following agreed-upon facts (Doc. # 56):

1.  [Defendant] is an employer covered by the [Fair Labor Standards Act].

2.  Plaintiffs' claim is that Defendant's method of compensating Plaintiffs was

1

not consistent with the salary basis test, presently codified at 29 C.F.R. § 541.602, and, thus, Plaintiffs contend that Plaintiffs were not exempt from the overtime provisions of the FLSA during the pay periods falling within the limitations period, and thus are entitled to overtime for hours worked over forty for each week during said limitations period, whatever said limitations period is determined to be.  Defendant contends that its pay plan at all times complied with the FLSA and that Plaintiffs are not entitled to overtime for any pay period during their employment with Defendant.  In the alternative, Defendant contends that to the extent any Plaintiffs are entitled to overtime, such liability period is limited to the period of time during which actual deductions occurred from Plaintiffs' salaries.

3.  The salary basis test is explained in 29 C.F.R. § 541.602(a), which provides, in part:
> An employee will be considered to be paid on a "salary basis" within the meaning of these regulations if the employee regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reductions because of variations in the quality or quantity of the work performed.

4.  Specifically, Plaintiffs believe that language in certain corporate bonus pay plans which covered them during their employment with Defendant, under which Defendant reserved the right to make deductions from their base salaries to recover for earlier bonus overpayments on a year-to-date basis, and the fact that such deductions were made from eight Plaintiffs as set forth in paragraphs 13 through 16, was inconsistent with the salary basis test.

**Corporate Bonus Pay Plans**
5.  Each Plaintiff was compensated under a corporate bonus pay plan for some period of time during which he or she was employed by Defendant during the time period potentially relevant to this lawsuit (February 8, 2003 through March 3, 2006).

6.  During the periods of time for which each Plaintiff was covered by a corporate bonus pay plan, he or she generally was paid a pre-determined amount of compensation, identified by [Defendant] as base salary, on a semi-monthly basis.  In addition to base salary, each Plaintiff was eligible to receive monthly bonus payments based on year-to-date performance according to guidelines set forth in his or her corporate bonus pay plan.

2

7.  The first date any Plaintiff was covered by a corporate bonus pay plan which contained language reserving Defendant's right to make deductions from Plaintiffs' base salaries to recover for earlier bonus overpayments on a year-to-date basis was January 1, 2004.  The periods of time each Plaintiff was covered by such corporate bonus pay plans (referred to as "corporate bonus pay plans at issue in this lawsuit") are set forth below in paragraphs 21 through 46.

**2004 Corporate Bonus Pay Plans**
8.  Defendant's 2004 corporate bonus pay plans, effective January 1, 2004, covered Plaintiffs employed during 2004 as senior management, [and] Member Activities Department Heads.  Around April 1, 2004, the plans were further extended to Life Café Department Heads.  The following Plaintiffs were covered by corporate bonus pay plans for some or all of 2004, as further specified below in paragraphs 21 through 46: Baden-Winterwood, Barge, Brevard, Chaney, Davenport, Galloway, Gregorich, House, Konieczny, Mendez, Nutinsky, and Schroeder.

9.  Plaintiffs' 2004 corporate bonus pay plans contained the following language: "If, during the year, YTD EBITDA [earnings before interest, taxation, depreciation, and amortization] Before Occupancy $ performance drops below the minimum performance level of 80% of plan, and payments have been made in previous months, then LTF reserves the right to reclaim the amount of the previous payments by reducing future semimonthly guarantee payments."

10.  No Plaintiff had his or her base salary reduced in 2004 to recover earlier bonus overpayments.

**2005 Corporate Bonus Pay Plans**
11.  Defendant's 2005 corporate bonus pay plans, effective January 1, 2005, covered Plaintiffs employed during 2005 as senior management, Member Activities Department Heads, Life Café Department Heads, and Life Spa Department Heads. The following Plaintiffs were covered by corporate bonus pay plans for some or all of 2005, as further specified below in paragraphs 21 through 46: Baden-Winterwood, Barclay, Barge, Brevard, Chaney, Erdman, Fuss, Galloway, Gregorich, House, Johnson, Lloyd, Mann, McCarthy, Mendez, Nutinsky, Richards, Seals, Visser, Volbrecht, Weiler, West, and Young.

12.  Plaintiffs' 2005 corporate bonus pay plans contained the following language:

"If, during the year, performance drops to a level such that bonus payments made exceed the amount earned, Life Time Fitness reserves the right to reclaim the amount of the overpayment by reducing future semi-monthly base salary payments."

13.  Across three pay dates in November and December 2005—namely, November 9, November 23, and December 9—a total of 8 Plaintiffs had their base salaries reduced to recover some of the amounts of unearned bonus overpayments they had received earlier in the year.

14.  Plaintiffs whose base salaries were reduced for the November 9, 2005 pay date were Baden-Winterwood, Barclay, Gregorich, House, and Young.

15.  Plaintiffs whose base salaries were reduced for the November 23, 2005 pay date were Baden-Winterwood, Erdman, Gregorich, House, and Young.

16.  Plaintiffs whose base salaries were reduced for the December 9, 2005 pay date were Baden-Winterwood, Barclay, Erdman, Galloway, Gregorich, House, Mendez, and Young.

**2006 Corporate Bonus Pay Plans**
17.  Defendant's 2006 corporate bonus pay plans, effective January 1, 2006, applied to the same universe of relevant positions as the 2005 corporate plans. Accordingly, the Plaintiffs employed as Member Activities Department Heads, Life Café Department Heads, and Life Spa Department Heads during some or all of 2006 generally were covered by the 2006 corporate bonus pay plans.  These individuals were Baden-Winterwood, Barclay, Erdman, Fuss, Galloway, Gregorich, Lloyd, Mann, McCarthy, Mendez, Visser, Weiler, West, and Young.

18.  Effective January 1, 2006, Defendant altered its corporate bonus pay plans to implement a 20% hold back "bank," which Defendant designed to protect the corporation from bonus overpayments on a year-to-date basis.  Defendant revised Plaintiffs' 2004 and 2005 corporate bonus pay plans to provide that "On a YTD basis if the amount of At Risk Pay or Performance Pay earned is less than the amount paid, Life Time Fitness Inc. reserves the right to reclaim the amount of the overpayment by reducing the 20% monthly hold-back and if necessary future semi-monthly base salary payments.  On an annual basis, in no case will the Guarantee Pay be lowered."

4

19.  Following the filing of the instant lawsuit, in recognition of the fact that at least one of its employees believed its corporate bonus pay plans may have violated the FLSA, and as an employee relations measure, Defendant decided to further alter its 2006 corporate bonus pay plans so that any attempts to recover earlier bonus overpayments would be taken only from the 20% hold back bank. On or around March 3, 2006, Defendant issued revised copies of its 2006 corporate bonus pay plans, which Defendant backdated to be effective January 1, 2006, and which contained the following language: "On a YTD basis if the amount of At-Risk Pay or Performance Pay earned is less than the amount paid, Life Time Fitness Inc. reserves the right to reclaim the amount of the overpayment from the banked Performance Pay hold-back.  In no case will the Guaranteed Pay be reduced."


20.  None of the Plaintiffs had his or her base salary reduced at any point during 2006 to recover earlier bonus overpayments.


**Facts Relevant to Individual Plaintiffs' Claims**
21.  Amy Baden-Winterwood has been employed by Life Time Fitness as a Member Activities Department Head from July 1, 1999 through the present.  She was covered by a corporate bonus pay plan at issue in this lawsuit from January 1, 2004 through March 3, 2006.


22. Jennifer Barclay was employed by Life Time Fitness as a Life Café Department Head from June 1, 2005 through January 15, 2006.  She was covered by a corporate bonus pay plan at issue in this lawsuit from June 1, 2005 through January 15, 2006.


23.  Victor Barge was employed by Life Time Fitness as a Director-Project Management Organization from July 6, 2004 through September 1, 2005.  He was covered by a corporate bonus pay plan at issue in this lawsuit from July 6, 2004 through September 1, 2005.


24.  Kristina Brevard was employed by Life Time Fitness as a Member Activities Department Head from April 30, 2004 through August 31, 2005.  She was covered by a corporate bonus pay plan at issue in this lawsuit from April 30, 2004 through August 31, 2005.

25.  Teresa Chaney was employed by Life Time Fitness from approximately August 1, 1999 through August 2, 2005.  She was employed as a Member Activities Department Head during the period from February 8, 2003 through August 2, 2005. She was covered by a corporate bonus pay plan at issue in this lawsuit from January 1, 2004 through August 2, 2005.

26.  Elizabeth (Campbell) Davenport was employed by Life Time Fitness as a Member Activities Department Head from October 15, 2002 through February 14, 2004.  She was covered by a corporate bonus pay plan at issue in this lawsuit from January 1, 2004 through February 14, 2004.

27.  Sarah (Swearman) Erdman has been employed by Life Time Fitness from approximately April 9, 2003 through the present.  She was employed as a Life Spa Department Head from June 1, 2005 through January 31, 2006. She was covered by a corporate bonus pay plan at issue in this lawsuit from June 1, 2005 through January 31, 2006.

28.  Meghan Fuss was employed by Life Time Fitness from approximately April 2004 through March 1, 2006.  She was employed as a Life Spa Department Head from July 16, 2005 through March 1, 2006.  She was covered by a corporate bonus pay plan at issue in this lawsuit from July 16, 2005 through March 1, 2006.

29.  Judith Galloway has been employed by Life Time Fitness as a Life Café Department Head from December 2, 2003 through the present.  She was covered by a corporate bonus pay plan at issue in this lawsuit from April 1, 2004 through March 3, 2006.

30.  Lisa Gregorich was employed by Life Time Fitness from approximately September 2003 through February 15, 2006.  She was employed as a Member Activities Department Head from December 16, 2003 through February 15, 2006. She was covered by a corporate bonus pay plan at issue in this lawsuit from January 1, 2004 through February 15, 2006.

31.  Jamie House has been employed by Life Time Fitness from January 21, 1999 through the present.  She was employed as a Member Activities Department Head from January 21, 1999 through approximately November 16, 2005. She was covered by a corporate bonus pay plan at issue in this lawsuit from January 1, 2004 through approximately November 16, 2005, when she became an hourly Member Activities Instructor.

32.  Chrisondra Johnson was employed by Life Time Fitness from September 15, 2004 through October 15, 2005.  She was employed as a Life Spa Department Head from February 1, 2005 through October 15, 2005; however, she went on unpaid leave on August 8, 2005, and performed no work thereafter.  She was covered by a corporate bonus pay plan at issue in this lawsuit from February 1, 2005 through October 15, 2005.

33.  Scott Konieczny was employed by Life Time Fitness as a Life Café Department Head from October 24, 2002 through October 1, 2004.  He was covered by a corporate bonus pay plan at issue in this lawsuit April 1, 2004 through October 1, 2004.

34.  Jacob Lloyd was employed by Life Time Fitness as a Life Spa Department Head from June 16, 2005 through February 15, 2006.  He was covered by a corporate bonus pay plan at issue in this lawsuit from June 16, 2005 through February 15, 2006.

35.  Christopher Mann has been employed by Life Time Fitness as a Life Café Department Head from March 1, 2005 through the present.  He was covered by a corporate bonus pay plan at issue in this lawsuit from March 1, 2005 through March 3, 2006.

36.  Jennifer McCarthy has been employed by Life Time Fitness as a Life Spa Department Head from July 7, 2003 through the present.  She was covered by a corporate bonus pay plan at issue in this lawsuit from January 1, 2005 through March 3, 2006.

37.  Angela Mendez has been employed by Life Time Fitness as a Life Café Department Head from May 13, 2002 through the present.  She was covered by a corporate bonus pay plan at issue in this lawsuit from April 1, 2004 through March 3, 2006.

38.  Robert Nutinsky was employed by Life Time Fitness from approximately December 2, 2003 to June 15, 2006.  He was employed as a Member Activities Department Head from March 1, 2004 through April 30, 2005.  He was covered by a corporate bonus pay plan at issue in this lawsuit from March 1, 2004 through April 30, 2005.

7

39.  Marcia Richards was employed by Life Time Fitness as a Life Spa Department Head from approximately September 28, 1999 through January 1, 2006.  She was covered by a corporate bonus pay plan at issue in this lawsuit from January 1, 2005 through January 1, 2006.

40.  Andrea Schroeder was employed by Life Time Fitness as a Member Activities Department Head from March 29, 2004 through September 2, 2004. She was covered by a corporate bonus pay plan at issue in this lawsuit from March 29, 2004 through September 2, 2004.

41.  Tina Seals was employed by Life Time Fitness at various times from approximately January 12, 1999 through October 24, 2005.  She was employed as a Member Activities Department Head from August 1, 2005 through October 24, 2005.  She was covered by a corporate bonus pay plan at issue in this lawsuit from August 1, 2005 through October 24, 2005.

42.  Bridgett Visser (now Ipema) was employed by Life Time Fitness from approximately August 15, 2001 until July 21, 2006.  She was employed as a Member Activities Department Head from January 1, 2005 through July 21, 2006. She was covered by a corporate bonus pay plan at issue in this lawsuit from January 1, 2005 through July 21, 2006.

43.  Aaron Volbrecht was employed by Life Time Fitness from approximately November 16, 2000 until August 1, 2005.  He was employed as a salaried Sales Manager from March 1, 2005 through August 1, 2005.  He was covered by a corporate bonus pay plan at issue in this lawsuit from March 1, 2005 through August 1, 2005.

44.  Elizabeth (Venezia) Weiler has been employed by Life Time Fitness from approximately September 29, 2004 through the present.  She was employed as a Life Spa Department Head from May 1, 2005 through July 5, 2006.  She was covered by a corporate bonus pay plan at issue in this lawsuit from May 1, 2005 through July 5, 2006.

45.  Theresa West was employed by Life Time Fitness at various times from approximately May 8, 2000 through February 17, 2007.  She was employed as a Life Spa Department Head from July 1, 2005 through July 31, 2006.  She was

covered by a corporate bonus pay plan at issue in this lawsuit from July 1, 2005 through July 31, 2006.

46.  Beth Ann Young (now Bird) was employed by Life Time Fitness as a Member Activities Department Head from February 7, 2005 through January 17, 2006.  She was covered by a corporate bonus pay plan at issue in this lawsuit from February 7, 2005 through January 17, 2006.

On February 8, 2006, Plaintiff Baden-Winterwood initiated the instant litigation, individually and as a putative representative for a collective action, asserting claims for unpaid wages and overtime and for declaratory and injunctive relief under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*  (Doc. # 1.)  The parties stipulated (Doc. # 20) to conditional certification of a class of employees employed by Defendant who, at any time between February 8, 2003, and present, (1) have not been paid overtime for hours worked over 40 during any given week; (2) have been paid a predetermined amount, which was identified by Defendant as base salary, during any given pay period; and (3) have been covered by a bonus or incentive compensation plan which includes or included a provision allowing for deductions to be made from the employee's base salary to recover for bonus or incentive overpayments.

Currently, the class comprises 26 individuals.  (Doc. # 56.)  Plaintiffs argue that they were not paid on a salary basis–and are thus entitled to overtime wages for each week of the class period–because their pay was subject to reduction "because of variations in the quality or quantity" of their work, in violation of FLSA's salary-basis test, 29 C.F.R. § 541.602(a) (2004). (Doc. # 62.)  Plaintiffs posit that they are entitled to liquidated damages, pursuant to 29 U.S.C. § 216(b) (2000), which allows a court to grant liquidated damages in the event of FLSA violations. (Doc. # 72.)  Additionally, Plaintiffs request attorneys' fees and costs.  (Doc. # 62.)

Conversely, Defendant argues that any reductions in Plaintiffs' salaries were to recover advances of bonus pay unearned by Plaintiffs. The reductions, Defendant claims, were unrelated to the quality or quantity of Plaintiffs' work, and therefore were not a violation of FLSA's salary-basis test. (Doc. # 57.) Alternatively, Defendant argues that to the extent any reductions violated the FLSA, Plaintiffs are entitled to overtime pay only for those pay periods when actual reductions occurred. (Doc. # 57.) Both parties have moved for partial or full summary judgment, and the motions are now ripe for disposition. (Docs. # 57, 62.)

## II. Discussion

### A.  Standard Involved

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *See Muncie Power Prods., Inc. v. United Techs. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

In viewing the evidence, the Court must draw all reasonable inferences in favor of the nonmoving party, which must set forth specific facts showing that there is a genuine issue of material fact for trial. *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234 (6th Cir. 2003). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party." *Muncie*, 328 F.3d at 873 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Consequently, the central issue is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Hamad*, 328 F.3d at 234-35 (quoting *Anderson*, 477 U.S. at 251-52).

### B. Analysis

The FLSA forbids employers from requiring employees to work more than forty hours per work week, unless the employer pays the employee at least one and one-half times his or her regular rate for the extra hours worked.  29. U.S.C. § 207(a)(1) (2000).  The statute exempts, however, workers employed in a bona fide executive, administrative, or professional capacity. 29 U.S.C. § 213(a)(1) (2000).  Exemptions must be narrowly construed against the employer asserting them.  *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960).  And " '[t]he employer bears the burden of proving that the exemption applies to the employee in question.' " *ACS v. The Detroit Edison Co.*, 444 F.3d 763, 767 (6th Cir. 2006) (quoting *Douglas v. Argo-Tech Corp.*, 113 F.3d 67, 70 (6th Cir. 1997)).  The precise burden of proof in the Sixth Circuit is unsettled.  Some courts have used a preponderance of the evidence standard, while others have applied the standard of "clear and affirmative evidence."  *ACS*, 444 F.3d at 767 (noting that courts using the " 'clear and affirmative evidence' standard 'have done so without explanation of what the phrase means.' " (quoting *Martin v. Ind. Mich. Power Co.*, 381 F.3d 574, 578 n.1 (6th Cir. 2004))).  The distinction is ultimately unimportant, however, because the employees' exemptions and, in some instances, non-exemptions in this case are clear regardless of the standard used.

To establish an overtime exemption under the FLSA for executive, administrative, or

11

professional employees, an employer must satisfy three tests: " 'a (1) duties test; (2) salary level test; and (3) salary basis test.' " *ACS*, 444 F.3d at 767 (quoting *Takacs v. Hahn Auto. Corp.*, 246 F.3d 776, 779 (6th Cir. 2001)); *see also* 29 C.F.R. § 541.700 (2004) (duties test); 29 C.F.R. § 541.600 (2004) (salary level test); 29 C.F.R. § 541.602 (2004) (salary basis test).

It is undisputed in this case that the only test in question is the salary-basis test.  As stipulated by the parties (Doc. #56 ¶ 3), at all times relevant to this suit the salary-basis test provided:

> An employee will be considered to be paid on a "salary basis" within the meaning of these regulations if the employee regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reductions because of variations in the quality or quantity of the work performed.

29 C.F.R. § 541.602(a) (2004).  Because the Secretary of the Department of Labor ("DOL") changed the official interpretation of the salary-basis test during the class period, however, this Court must consider the different interpretations.

### 1. The salary-basis test before and after August 23, 2004

As stipulated by the parties (Doc. #56 ¶ 7), the first date any Plaintiff was covered by a corporate bonus pay plan containing language reserving Defendant's right to make deductions from Plaintiffs' base salaries was January 1, 2004.  At that time, the controlling interpretation of the salary-basis test was set forth in *Auer v. Robbins*.  519 U.S. 452 (1997).  The Supreme Court in *Auer* recognized that the FLSA grants the Secretary of Labor "broad authority to 'defin[e] and delimi[t]' the scope of the exemption for executive, administrative, and professional employees." *Id.* at 456 (quoting 29 U.S.C. § 213(a)(1)) (alterations in original).  The Court held that because "the salary-basis test is a creature of the Secretary's own regulations, his interpretation of it is,

under our jurisprudence, controlling unless " 'plainly erroneous or inconsistent with the regulation.' "  *Id.* at 461 (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 359 (1989)).  In an *amicus* brief filed with the Court, the Secretary of Labor interpreted the salary-basis test to deny exempt status for employees when employers are permitted to deduct pay for disciplinary or other reasons "as a practical matter."  *Id.* at 461.  The Secretary concluded–and the Court agreed–that the standard is met "if there is either an actual practice of making such deductions or an employment policy that creates a 'significant likelihood' of such deductions."  *Id.*  The Court continued:

> The Secretary's approach rejects a wooden requirement of actual deductions, but in their absence it requires a clear and particularized policy–one which "effectively communicates" that deductions will be made in specified circumstances.  This avoids the imposition of massive and unanticipated overtime liability . . . in situations in which a vague or broadly worded policy is nominally applicable to a whole range of personnel but is not "significantly likely" to be invoked against salaried employees.

*Id.*  (quoting DOL *amicus* brief).

That interpretation of the salary-basis test continued until August 23, 2004, when the Secretary of Labor, without altering the language of the test itself, issued new regulations that further refined what it means to be "subject to" improper salary deductions.  Importantly, the Secretary dropped the part of the test, adopted in *Auer*, that said a "significant likelihood" of improper deductions was sufficient to cause an employee to lose his or her exemption.  Under the new regulations, only "[a]n *actual practice* of making improper deductions demonstrates that the employer did not intend to pay employees on a salary basis."  29 C.F.R. § 541.603(a) (2004) (emphasis added).  Furthermore, § 541.603(b) provides that "[i]f the facts demonstrate that the employer has an actual practice of making improper deductions, the exemption is lost during the time period in which the improper deductions were made for the employees in the same job

13

classification working for the same managers responsible for the actual improper deductions."

29 U.S.C. § 541.603(b) (2000).

> In explaining the changes, the DOL said:

> Any other approach, on the one hand, would provide a windfall to employees who have not even arguably been harmed by a "policy" that a manager has never applied and may never intend to apply, but on the other hand, would fail to recognize that some employees may reasonably believe that they would be subject to the same types of impermissible deductions made from the pay of similarly situated employees.

Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 69 Fed. Reg. 22,122, 22,180 (Apr. 23, 2004).  DOL continued by noting that the "final rule represents a departure from the Department's position in *Auer v. Robbins*. . . . The 'significant likelihood' test is not found in the FLSA itself or anywhere in the existing Part 541 regulations.  Moreover, nothing in *Auer* prohibits the Department from making changes to the salary basis regulations after appropriate notice and comment rulemaking."  *Id.*

As noted by Defendants, "no reported decisions have analyzed the contours of the DOL's most recent interpretations of the salary-basis test."  (Doc. # 57, at 29.)  However, the plain meaning of the new regulations, together with the deference given to the Secretary of Labor in *Auer*, provide ample guidance on how to handle the instant case.

### 2. The pre-August 23, 2004, interpretation of the salary-basis test as applied to Defendant's corporate bonus pay program

Plaintiffs argue that the Supreme Court's interpretation of the salary-basis test in *Auer* should apply to the entire class period.  (Doc. # 72.)  Defendants counter that DOL's new regulations, adopted in August 2004, should govern, or at least strongly inform, the interpretation of the test prior to that date.  (Doc. # 71.)  *See, e.g., Bowman v. Builder's Cabinet Supply Co.*, 2006 U.S. Dist. LEXIS 62712, at *10 (E.D. Ky. Aug. 23, 2006); *Johnson v. Target*

14

*Corp.*, 2006 U.S. Dist. LEXIS 15876, at *12 n.1 (E.D. Tenn. March 8, 2006); *Casto v. Royal Oak Indus., Inc.*, 2006 U.S. Dist. LEXIS 8282, at *11 n.6 (W.D. Mich. Feb. 10, 2006) (all applying new interpretation in situations where plaintiffs filed suit after the new interpretation took effect).

As to the period prior to August 23, 2004, this Court need not decide which interpretation of the salary-basis test to use.  Under either interpretation–whether the Court considers the existence of an actual practice *and* a significant likelihood of improper deductions, or just an actual practice of deductions–Defendant did not violate the test.

First, the parties have stipulated that Defendant made no deductions from the salaries of any class members between January 1, 2004, the first date on which any class member was covered by one of the corporate bonus pay plans in question, and August 23, 2004, when DOL's new regulations took effect.  (Doc. # 56 ¶ 10.)  Thus, it is clear from that stipulation that Defendant did not have an actual practice of making improper salary deductions from class members.

Second, this Court also finds that it was not significantly likely that Defendant was going to make improper salary deductions between January 1, 2004, and August 23, 2004.  The bonus plan for certain class members in effect at that time, as stipulated by the parties, provided that if an employee received monthly bonus advances and then the employee's performance fell below a particular level under the plan's provisions, Defendant "reserves the right to reclaim the amount of the previous payments by reducing future semi-monthly guarantee payments."  (Doc. # 56 ¶ 9.)  Put simply, the fact that a company reserves the right to make salary deductions does not make it significantly likely that it will do so.  As the Supreme Court held in *Auer*, for there to

15

be a significant likelihood of salary deductions under the Secretary of Labor's prior interpretation of the salary-basis test, there had to be a "clear and particularized policy–one which 'effectively communicates' that deductions *will be made* in specified circumstances." *Auer*, 519 U.S. at 461 (emphasis added). Defendant's 2004 bonus plan did not state that deductions definitely would be made in certain situations. It simply gave Defendant the option to do so.

Plaintiffs disagree. To support their argument, they cite *Takacs v. Hahn Automotive Corp.*, 246 F.3d 776 (6th Cir. 2001), and *Belcher v. Shoney's, Inc.*, 30 F. Supp. 2d 1010 (M.D. Tenn. 1998). In *Takacs*, the court found an automotive retailing company with a policy allowing it to suspend salaried employees without pay was significantly likely to make the deductions in violation of the salary-basis test. *Takacs*, 246 F.3d at 781. In *Belcher*, the Court concluded that a restaurant company with a policy allowing it to dock the pay of some salaried employees for failing to comply with its bank-deposit procedures also was significantly likely to make the deductions. *Belcher*, 30 F. Supp. 2d at 1019-1020. What Plaintiffs fail to mention, however, is that in both cases the companies also had a well-documented *actual practice* of improper deductions. In *Takacs*, seven members of management were suspended without pay during the period in question, and on twelve other occasions several other members of management were threatened in writing with suspensions without pay. *Takacs*, 246 F.3d at 778. In *Belcher*, the defendant over several years made 1,229 deductions from the salaries of employees in 23 percent of its restaurants. *Belcher*, 30 F. Supp. 2d at 1020. It is hardly surprising, in other words, that courts would find a significant likelihood of improper salary deductions in cases where companies were actually making such deductions. To reiterate, Defendant in the instant case

16

made no deductions from the salaries of its employees between January 1, 2004, and August 23, 2004.

Other factors also distinguish the instant case from the circumstances in *Takacs* and *Belcher*. Notably, the policies in place at the companies in those cases made it much more likely that actual deductions would occur. The policy at the company in *Takacs* stated that if a salaried employee was suspended for violating company policy, that employee " '*should not be paid* for scheduled time missed.' " *Takacs*, 246 F.3d at 781 (quoting store operations manual) (emphasis added). Additionally, the policy "detail[ed] the procedures necessary to suspend an associate." *Id.* And in *Belcher*, "the company even had a form specifically drafted for this purpose [of making deductions], and an accounting procedure that was approved by the Executive Committee of the Board of Directors." *Belcher*, 30 F. Supp. 2d at 1020. Both of those policies are the type of "clear and particularized policy," described by the Court in *Auer*, that " 'effectively communicates' that deductions *will be made* in specified circumstances." *Auer*, 519 U.S. at 461 (quoting DOL *amicus* brief) (emphasis added). The bonus plan utilized by Defendant between January 1, 2004, and August 23, 2004–a clause that simply *reserves the right* of Defendant to make deductions–is not.

Plaintiffs also try to support their argument by pointing to this exchange during the deposition of Derrick Boaz, Defendant's compensation and human resources information systems manager:

> Q. Prior to 2005 fall, these employees had no idea that they were subject to this deduction, did they?
> A. I don't know that. I would disagree with that.
> Q. Why would you disagree with that?
> A. Well, it's on the comp plan.
> Q. Their performance–or their compensation plan?

17

> A.  Well, it says right there on the front page.
> Q.  And you're holding which exhibit?
> A.  6.
> Q.  And did they receive those plans.
> A.  Oh, yeah.
> Q.  Well, those—wouldn't you agree that those plans are very ambiguous, that I could read it and say, Well, I'm not going to be subject to that; that's not too clear?
> A.  I would disagree with that.
> Q.  Would you say it's very clear that under that plan, that if there was an overpayment . . . *it was a definite that you're subject to this deduction.*
> A.  *Yes.*

Boaz Dep. at 49-50 (emphasis added).  It bears repeating, again, that being subject to salary deductions is not the same thing as working under a policy that makes it significantly likely that deductions will occur.  Another Sixth Circuit case, *Whisman v. Ford Motor Co.*, is instructive on this point.  157 F. App'x 792 (6th Cir. 2005).  In *Whisman*, a company executive issued a memorandum, prior to DOL issuing its new interpretation in August 2004, warning salaried employees that their time sheets would be audited against reports generated when the employees entered and exited the building using security cards.  *Id.* at 795.  If there were unexplained discrepancies, the memo warned, the employees could suffer pay deductions.  *Id.*  Relying on the fact that there was no evidence that the company ever routinely monitored the movements of its salaried employees or docked their pay for discrepancies, the *Whisman* court concluded that the employees were indeed paid on a salary basis because there was no more than a "theoretical possibility" that deductions would occur.  *Id.* at 798.

The *Whisman* court got it right, and the same reasoning applies in the instant case.  In deciding *Auer*, the Supreme Court had to decide whether "an employee's pay is 'subject to' disciplinary or other deductions whenever there exists a theoretical possibility of such deductions, or rather only when there is something more to suggest that the employee is actually

18

vulnerable to having his pay reduced." *Auer*, 519 U.S. at 459 (quoting C.F.R. § 541.602(a) (2004)).  The Supreme Court and, following suit, the *Whisman* court clearly opted for the latter, deciding that "something more" is required to find a violation of the salary-basis test under the DOL's prior interpretation of it.  Accordingly, because there is no evidence that Defendant–between January 1, 2004, and August 23, 2004–had developed any kind of plan that would indicate more of an intent to actually make improper salary deductions, or that it actually docked the pay of any salaried employees pursuant to the program's terms, this Court finds that Defendant did not violate the salary-basis test during that period.  Defendant is therefore entitled to summary judgment on that portion of Plaintiffs' claim.

### 3. The post-August 23, 2004, interpretation of the salary-basis test as applied to Defendant's corporate bonus pay program

Plaintiffs posit that the interpretation of the salary-basis test adopted by the Supreme Court in *Auer*–that improper deductions are permitted as a "practical matter" if an employer has an actual practice of making improper salary deductions *or* is significantly likely to make such deductions–should continue to apply even after the DOL adopted its new interpretation of the test on August 23, 2004.  (Doc. # 72, at 3) (quoting *Auer*, 519 U.S. at 461).  To fail to do so, they submit, would "fl[y] in the face of Supreme Court precedent."  (Doc. # 72, at 3.)  This Court is not persuaded.  To fail to apply the new interpretation of the salary-basis test would go against Supreme Court precedent and the clear trend in Sixth Circuit case law.

As the Supreme Court held in *Auer*, the Secretary of Labor's interpretation of the test controls unless it is " 'plainly erroneous or inconsistent with the regulation.' " *Auer*, 519 U.S. at 461 (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 359 (1989)).  The Court did not hold that the Secretary of Labor's interpretation at that time–1997–would continue

19

to control indefinitely.  Rather, the Court clearly considered the possibility that the Secretary of

Labor's interpretation could change over time and decided that courts should give great

deference to the interpretation regardless of any changes.  In this case, as already noted, with the

adoption of C.F.R. § 541.603, DOL was plainly announcing its intention to break with the

agency's prior interpretation of the salary-basis test.  Effective August 23, 2004, the Secretary of

Labor dropped the "significant likelihood" portion of the test, a change that can hardly be called

"plainly erroneous or inconsistent with the regulation," especially in light of the commentary on

the new interpretation in the Federal Register.  69 Fed. Reg. 22,122, 22,180 (April 23, 2004)

(explaining that the "significant likelihood" portion of the test was never included in the actual

text of the regulation, and that the new interpretation provides a better balance between

employers and employees).  Moreover, there is an unmistakable trend in the Sixth Circuit to

apply the new interpretation in cases arising after August 23, 2004.  *See, e.g., Bowman*, 2006

U.S. Dist. LEXIS 62712, at *10; *Johnson*, 2006 U.S. Dist. LEXIS 15876, at *12 n.1; *Casto*, 2006

U.S. Dist. LEXIS 8282, at *11 n.6 (all applying new interpretation in situations where plaintiffs

filed suit after the new interpretation took effect).

Accordingly, this Court must determine whether Defendant–between August 23, 2004,

when the new interpretation took effect, and March 3, 2006, when Defendant altered its

corporate bonus pay plan to make clear that "[i]n no case will the Guaranteed Pay be

reduced"–had an actual practice of making improper salary deductions from class members.

Deductions are improper if they are based on "variations in the quality or quantity of the work

performed."  29 C.F.R. § 541.602(a) (2004).  If this Court finds that Defendant had an actual

practice of making such deductions, then the class members will lose their exemption only

"during the time period in which the improper deductions were made for employees in the same job classification working for the same managers responsible for the actual improper deductions." 29 C.F.R. § 541.603(b) (2004).  When determining whether an employer has an actual practice of improper deductions, the factors to consider include, but are not limited to:

> the number of improper deductions, particularly as compared to the number of employee infractions warranting discipline; the time period during which the employer made improper deductions; the number and geographic location of employees whose salary was improperly reduced; the number and geographic location of managers responsible for taking the improper deductions; and whether the employer has a clearly communicated policy permitting or prohibiting improper deductions.

29 C.F.R. § 541.603(a) (2004).  Notably, § 541.603(e) provides that "[t]his section should not be construed in an unduly technical manner so as to defeat the exemption."  29 C.F.R. § 541.603(e) (2004).

From August 23, 2004, until November 9, 2005, the first date that one of the salary deductions in question occurred, this Court finds that Defendant did not have an actual practice of deductions because no actual deductions occurred.  True, one of the factors listed in 29 C.F.R. § 541.603(a) is whether an employer has "a clearly communicated policy permitting . . . improper deductions."  Here, assuming that Defendant's bonus plans permitted improper deductions, Defendant did clearly communicate its policy through materials provided to the class members.  But the presence of a "clearly communicated policy" is just one factor among many that a court can consider.  Here, it would be illogical to find that Defendant had an actual practice of improper deductions in the absence of a track record of deductions.

The situation changed, however, across three pay dates in late 2005, specifically, November 9, November 23, and December 9.  On those dates, eight of the twenty-six Plaintiffs

"had their base salaries reduced to recover some of the amounts of unearned bonus overpayments they had received earlier in the year."  (Doc. # 56 ¶ 13.)  What this Court must decide is whether those deductions were made "because of variations in the quality or quantity of work performed," in violation of the salary-basis test.  29 C.F.R. § 541.602(a) (2004).

The corporate bonus pay plans in effect at the time for twenty-four of the twenty-six Plaintiffs—those who were department heads—were based on the year-to-date results of their various departments as measured against annual goals for revenue and a profit measure known as EBITDA (earnings before interest, taxation, depreciation, and amortization).  (Doc. # 57, at 7.) Eligible employees could receive advanced annual bonus payments on a monthly basis.  (Doc. # 57, at 6.)  The payments were variable: those whose departments' year-to-date results were closer to meeting annual goals would receive larger monthly bonus payments than those whose departments' year-to-date results were worse.  (Doc. # 57, at 7-8.)  Because of the structure of the plans, it was possible for a department head early in the year to be on pace to meet annual goals, and receive the requisite monthly bonus payments, but then fall off pace, resulting in a net bonus overpayment for that employee at the end of the year.  (Doc. # 57, at 8.)  The eight Plaintiffs who had their base salaries reduced received such overpayments.

Defendant maintains that the deductions were simply reductions in salary to recover unearned advances of bonus pay, and were not related to the quality or quantity of the work of affected employees.  (Doc. # 57, at 30-31.)  Defendant cites purportedly supportive DOL materials.  For instance, Defendant submits that DOL recently recognized that " '[r]ecovery of salary advances would not affect an employee's exempt status, because it is not a deduction based on variations in the quality or quantity of the work performed.' "  (Doc. # 57, at 30)

22

(quoting 69 Fed. Reg. 22,122, 22,178 (Apr. 23, 2004)).  Defendant also quotes DOL opinion

letters supporting recovery of certain types of overpayments.  *See, e.g.,* Department of Labor,

Wage and Hour Division Opinion Letter of March 20, 1998, 1998 WL 852662 (allowing the

recovery of $18,000 paid to a salaried employee because of a payroll department mistake); *see*

*also* Department of Labor, Wage and Hour Division Opinion Letter of Oct. 8, 2004, 2004 WL

3177896 (allowing for recovery of paid vacation hours in case where a salaried employee who

had only 32 available vacation hours was inadvertently paid for 75 hours).  Additionally,

Defendant claims that because the bonus plans were pegged to *department* performance, and not

*individual* performance, bonus payments and any necessary salary deductions were based on

factors largely unrelated to the quality or quantity of work of individual employees.  (Doc. # 57,

at 31.)  Defendant's arguments are not compelling.

  First, the DOL materials cited by Defendant, while supportive of the recovery of

advances and overpayments in certain situations, do not sanction the recovery of overpayments

in this case.  Defendant's deductions were not to recover salary advances or payments

mistakenly made by the payroll department.  The overpayments in the instant case were made as

part of a bonus program and they were made knowingly.  In other words, the overpayments and

subsequent salary deductions here were qualitatively different than those described in the cited

DOL materials.

  Second, it is disingenuous for Defendant to argue that individual performance played a

minor role in its bonus plans.  Defendant submits that whether a Plaintiff received a monthly

bonus payment depended on numerous factors, including "the size and location of the particular

fitness center at which the employee was employed, fitness-center usage dynamics and seasonal

variations, the budgeting process, the maturity of the fitness center, and the results of the particular fitness center as a whole."  (Doc. # 57, at 31.)  In other words, it depended on things mostly out of Plaintiffs' control.  Surely, those factors played some role in a particular department's performance.  But it is strange for Defendant to argue that individual performance was mainly irrelevant to the computation of bonus payments.  Defendant offered, after all, that it created the bonus plans "[a]s a means of providing incentives for certain of its employees . . . ." (Doc. # 57, at 6.)  The Court fails to understand what incentives a bonus plan provides employees if that bonus plan operates independently of employee performance.

Plaintiffs gathered a wide and persuasive array of testimony from managers and executives for Defendant to support their argument that the bonus plans were largely pegged to individual performance.  Defendant's senior director of human resources noted that the sale of memberships, swimming lessons, birthday parties, spa services and products, nutritionals, food and beverages, and personal training sessions by department heads make up "quite a bit" of Defendant's revenue.  (Pollock Dep. at 80-82.)  One of Defendant's general managers testified that to receive bonus payments required monitoring payroll and the budget, considering launching new programs, or figuring out ways to run existing ones more efficiently.  (Messerli Dep. at 37-38.)  Defendant's member activities director said department heads influence revenue by offering basketball leagues, volleyball leagues, and birthday parties, approaching corporations about team-building events, and drumming up summer-camp business.  (Shipe Dep. at 23-25.) Defendant's spa director testified that department heads influence revenue by actively working to keep customers when, for instance, their preferred spa technician leaves Defendant's employment, and coordinating promotions, such as mini-makeovers.  (Adams Dep. at 54-56.)

24

Defendant's café director testified that department heads are responsible for inventory control, monitoring staffing and labor costs, tracking key performance indicators on a daily basis, and offering free samples to increase food and drink sales.  (Zylstra Dep. at 29-32.)

The picture of department heads that emerges from the depositions is one of a group of employees whose individual performances greatly influenced whether they received bonus payments based on revenue and EBITDA.  Andrew Messerli, one of Defendant's general managers, put it best when he testified that department heads "were responsible for their business units and acting as business owners for their individual areas."  (Messerli Dep. at 38-39.)  Department heads, depending on their skill, foresight, enthusiasm, and general business acumen, could make or break the annual targets for a particular department.  To maintain, as Defendant does, that individual performance was generally unimportant cuts against the very reason for starting the bonus plans, as well as the weight of the evidence in this case.  Therefore, this Court finds that when the performance of the individual Plaintiffs fell below Defendant's expectations, resulting in bonus overpayments, Defendant reduced Plaintiffs' salaries precisely because of the change in their individual performances.  It follows that the deductions from the salaries of eight of the Plaintiffs were deductions resulting from "variations in the quality or quantity of the work performed," in violation of the salary-basis test.  29 C.F.R. § 541.602(a) (2004).  Plaintiffs are entitled to summary judgment on the part of their claim covered by the three pay periods when actual deductions occurred—November 9, November 23, and December 9, 2005—and only for "employees in the same job classification working for the same managers responsible for the actual improper deductions."  29 C.F.R. § 541.603(a) (2004).

Consequently, department heads working for Defendant during those pay periods who

are parties to this action are entitled to overtime pay for those periods.  Those individuals are: Baden-Winterwood, Barclay, Erdman, Fuss, Galloway, Gregorich, House, Lloyd, Mann, McCarthy, Mendez, Richards, Visser, Weiler, West, and Young.  Individuals who are parties to this action who were not department heads working for Defendant during those pay periods are not entitled to any overtime.  Those individuals are: Barge, Brevard, Chaney, Davenport, Johnson, Konieczny, Nutinsky, Schroeder, Seals, and Volbrecht.

### 4. Liquidated damages under the FLSA

Section 216(b) of the FLSA provides that "[a]ny employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages."  29 U.S.C. § 219(b) (2000).  If, however, an employer "shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation" of the FLSA, "the court may, in its sound discretion, award no liquidated damages" to a prevailing plaintiff.  29 U.S.C. § 260 (2000); *see also Elwell v. Univ. Hosp. Home Care Serv.*, 276 F.3d 832, 840 (6th Cir. 2002) (concluding that the district court abused its discretion in not awarding liquidated damages to the plaintiff because the defendant did not meet its burden of proving that it was acting in good faith when it instituted a compensation plan that violated the FLSA).  The burden on the employer "is substantial and requires 'proof that [the employer's] failure to obey the statute was *both* in good faith and predicated upon such reasonable grounds that it would be unfair to impose upon [it] more than a compensatory verdict.' "  *Elwell*, 276 F.3d at 830 (quoting *McClanahan v. Mathews*, 440 F.2d

320, 322 (6th Cir. 1971) (emphasis in original). An employer "has an affirmative duty to ascertain and meet the FLSA's requirements, and an employer who negligently misclassifies an employee as exempt is not acting in good faith." *Twaddle v. RKE Trucking Co.*, No. 2:04-CV-557, 2006 U.S. Dist. LEXIS 18028, at *35 (S.D. Ohio March 29, 2006) (quoting *Martin v. Ind. Mich. Power Co.*, 381 F.3d 574, 584 (6th Cir. 2004)). If an employer offers no such proof, " 'a district court has no power or discretion to reduce an employer's liability for the equivalent of double unpaid wages.' " *Id.* Moreover, even if an employer meets its burden, "a court nevertheless 'may award full liquidated damages equal to, and in addition to, the unpaid back wages.' " *Schneider v. City of Springfield*, 102 F. Supp. 2d 827, 840 (S.D. Ohio 1999) (quoting *McClanahan*, 440 F.2d at 323).

Plaintiffs argue that they are entitled to liquidated damages because Defendant has failed to meet its burden and, furthermore, has shown a "complete and utter lack of effort to investigate whether it was complying with the salary basis test . . . ." (Doc. # 74, at 17.) To support this contention, Plaintiffs rely primarily on the testimony of Lisa Pollock, Defendant's senior director of human resources, and Derrick Boaz, Defendant's compensation and human resources information systems manager. For instance, Pollock, an individual responsible for making sure Defendant complies with the FLSA (Pollock Dep. at 14), testified that she never inquired at the Department of Wage and Hour about the salary component of the FLSA's exemptions and could not recall any seminars she attended regarding those exemptions. (Pollock Dep. at 17-18.) Similarly, Boaz testified that since joining the company in October 2004, he attended one half-day seminar session on the FLSA in 2005, could not recall any conversations with other employees of Defendant about the legality of the corporate bonus pay plans, and never called the

Department of Labor about their legality.  (Boaz Dep. at 38-45.)  All of that, Plaintiffs argue, adds up to negligence on the part of Defendant about the legality of the bonus plans (Doc. # 72, at 16), and negligence is sufficient to allow liquidated damages.  *See, e.g., Twaddle*, No. 2:04-CV-557, 2006 U.S. Dist. LEXIS 18028, at *35.

Defendant does not directly address Plaintiffs' argument regarding liquidated damages. In two footnotes (Doc. # 71, at 1 n.1; Doc. # 73, at 2 n.1), Defendant submits that Plaintiffs are only entitled to liquidated damages if they establish liability and that, based on Defendant's arguments regarding liability, Plaintiffs are not entitled to liquidated damages.  Defendant does, however, offer relevant evidence on the issue of liquidated damages when discussing the statute of limitations that should apply to this case, which the Court deals with below.  The question of Defendant's willfulness in violating the FLSA is central to the statute of limitations question, and is also applicable here.

Pointing to the same depositions as Plaintiffs, Defendant came to a markedly different conclusion.  Defendant notes (Doc. # 57, at 3-4), that Lisa Pollock testified that she regularly attends continuing education classes and seminars, including, in particular, a two-day session that deals specifically with employment law topics.  (Pollock Dep. at 14-15, 18.)  Pollock also testified that when she has wage-and-hour questions, she consults DOL's website and hotline, as well as the Society for Human Resource Management website.  (Pollock Dep. at 15-16.) Additionally, she testified that she consults with in-house and outside counsel on wage-and-hour issues.  (Pollock Dep. at 42-43.)   As for Derrick Boaz, Defendant notes (Doc. #57, at 4) that he has 20 years of experience working with the FLSA and other wage-and-hour laws (Boaz Dep. at 8-9), and that for guidance he relies on the FLSA seminar he attended in 2005, DOL regulations

and a commercial handbook on the FLSA.  (Boaz Dep. at 9, 10, 34.)  Boaz also testified that he

believed the bonus plans complied with the FLSA because they did not result in salary

deductions for any employees *on an annual basis*.  (Boaz Dep. at 14-15.)  Defendant concludes

that the record–rather than, as Plaintiffs suggest, supporting the view that it failed to investigate

the legality of its bonus plans–"clearly reveals a Company committed to compliance with the

FLSA and which believed at all times it was acting in compliance with the DOL's regulations

and the salary-basis test."  (Doc. #73 at 23.)

Although Defendant does not directly address Plaintiffs' argument on liquidated

damages, the Court concludes that there is enough evidence on the issue to conclude that genuine

issues of material fact preclude a decision on Plaintiffs' claim for liquidated damages.  The issue

must be resolved by the trier of fact.

### 5. The statute of limitations under the FLSA

The parties dispute whether this Court can decide whether a two- or three-year statute of

limitations applies to this case.  The relevant provision states that an action is to be commenced

"within two years after the cause of action accrued . . . except that a cause of action arising out of

a willful violation may be commenced within three years after the cause of action accrued."  29

U.S.C. § 255(a) (2000).  The burden is on the plaintiff to show that the employer "either knew or

showed reckless disregard for whether its conduct violated the FLSA."  *Claeys v. Gandalf Ltd.*,

303 F. Supp. 2d 890, 893 (S.D. Ohio 2004) (citing *McLaughlin v. Richland Shoe Co.*, 486 U.S.

128, 133 (1988)).

Plaintiffs argue that there is a genuine issue of material fact regarding Defendant's

willfulness that precludes summary judgment for Defendant on this issue.  (Doc. # 72, at 19.)

Defendant submits that Plaintiff failed to meet its burden of proving willfulness and that, therefore, the two-year statute of limitations should apply.

The Court concludes that the issue is moot.  The instant action was filed on February 8, 2006.  Under a two-year statute of limitations, Plaintiffs would be prohibited from claiming any unpaid wages or overtime prior to February 8, 2004.  Under a three-year statute of limitations, the period open for unpaid wages would stretch back to February 8, 2003.  Because the Court has found that Defendant's only violations of the FLSA occurred in late 2005, however, it is immaterial whether a two- or three-year statute of limitations applies.

**6. Attorneys' fees in the event of FLSA violations**

As Plaintiffs note (Doc. # 62, at 20), 29 U.S.C. § 216(b) provides that "[t]he court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs," in the event a defendant violates the FLSA, "allow a reasonable attorney's fee to be paid by the defendant, and costs of the action."  Because Defendant is liable for its 2005 FLSA violations, it is required to pay attorneys' fees and costs, in an amount to be determined at trial, or in a post-trial proceeding.

## III. Conclusion

For the foregoing reasons, the Court partially **GRANTS** Plaintiffs' motion for summary judgment (Doc. # 62) as it relates to Defendant's FLSA violations for the pay periods of November 9, November 23, and December 9, 2005, **GRANTS** Plaintiffs' motion as it relates to the request for attorneys' fees, **DENIES** Plaintiffs' motion as it relates to alleged FLSA violations during the rest of the class period, **DENIES** Plaintiffs' motion as it relates to the request for liquidated damages, **GRANTS** Defendant's motion for summary judgment (Doc. # 57) as it relates to alleged FLSA violations for the pay periods besides those of November 9,

30

November 23, and December 9, 2005, and **DENIES** Defendant's motion as it relates to the aforementioned pay periods where the Court has determined it violated the FLSA.  In light of this opinion and order, the issue of the statute of limitations that should apply to this case is now moot.

This matter will be scheduled for a status conference to establish a final pretrial conference and a date for trial to conclude this matter.

**IT IS SO ORDERED.**

＿＿**/s/    Gregory L. Frost**＿＿＿＿
GREGORY L. FROST
UNITED STATES DISTRICT JUDGE