**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**AMY BADEN-WINTERWOOD,** *et al.*,

          **Plaintiffs,**                    **Case No. 2:06-cv-99**
                                                **JUDGE GREGORY L. FROST**
        **v.**                                **Magistrate Judge Mark R. Abel**

**LIFE TIME FITNESS INC.,**

          **Defendant.**

**OPINION AND ORDER**

      This matter came before the Court on June 22, 2010 for a bench trial, which continued

through June 24, 2010.  Having taken the matter under advisement at the conclusion of that trial,

the Court now issues its decision in favor of Plaintiffs.

**I.  Background**

      On February 8, 2006, Plaintiff Amy Baden-Winterwood initiated the instant litigation,

individually and as a putative representative for a collective action, asserting claims for unpaid

wages and overtime and for declaratory and injunctive relief under the Fair Labor Standards Act

("FLSA"), 29 U.S.C. § 201 *et seq.*, against her employer, Defendant Life Time Fitness

("Defendant" or "LTF").  LTF is a Minnesota corporation that owns and operates approximately

90 health and fitness centers throughout the United States.

      On August 8, 2006, the parties stipulated (Doc. # 20) to the conditional certification of a

class of employees employed by LTF who, at any time since February 8, 2003 (1) had not been

paid overtime for hours worked over 40 during any given week; (2) had been paid a

predetermined amount, which was identified by LTF as base salary, during any given pay period;

and (3) had been covered by a bonus or incentive compensation plan which included a provision allowing for deductions to be made from the employee's base salary to recover for bonus or incentive overpayments.

Plaintiff Baden-Winterwood mailed notice to the potential class members and, currently, the class consists of 24 individuals who are current or former employees of LTF ("Plaintiffs"). Plaintiffs are divided into four different employment departments: 11 are Department Heads in Member Activities, 5 are Department Heads in the Life Café, 7 are Department Heads in the Life Spa, and 1 is the Director of Project Management Organization ("Director of PMO").

## II.  Summary Judgment Decision and Appeal of that Decision

On April 20, 2007, Plaintiffs moved for summary judgment arguing that they were entitled to overtime wages for each week of the class period because they were not paid on a salary basis.  (Doc. # 62.)  Specifically, Plaintiffs claimed that they were not paid on a salary basis because their pay was subject to reduction as a result "of variations in the quality or quantity" of their work, in violation of FLSA's salary-basis test, 29 C.F.R. § 541.602(a). Plaintiffs further claimed that they were entitled to liquidated damages pursuant to 29 U.S.C. § 216(b) and attorneys' fees and costs.

Also on April 20, 2007, Defendant moved for summary judgment arguing that any reductions in Plaintiffs' salaries were to recover advances of bonus pay unearned by Plaintiffs. (Doc. # 57.)  The reductions, Defendant claimed, were unrelated to the quality or quantity of Plaintiffs' work, and therefore, were not a violation of FLSA's salary-basis test.  Alternatively, Defendant argued that to the extent any reductions violated the FLSA, Plaintiffs were entitled to overtime pay only for those pay periods when actual reductions occurred.

2

On July 10, 2007, the Court issued an Opinion and Order on the parties' cross motions for summary judgment granting each in part and denying each in part.  In that decision, the Court explained that to establish an overtime exemption under the FLSA an employer must satisfy three tests: " 'a (1) duties test; (2) salary level test; and (3) salary basis test.' " *ACS v. Detroit Edison Co.*, 444 F.3d 763, 767 (6th Cir. 2006) (quoting *Takacs v. Hahn Auto. Corp.*, 246 F.3d 776, 779 (6th Cir. 2001)); *see also* 29 C.F.R. § 541.700 (2004) (duties test); 29 C.F.R. § 541.600 (2004) (salary level test); 29 C.F.R. § 541.602 (2004) (salary basis test)."  (Doc. # 75 at 12.)  The Court bifurcated the time period at issue, finding that the Supreme Court's interpretation of the salary-basis test in *Auer v. Robbins*, 519 U.S. 452 (1997), controlled for the time period before August 23, 2004, while 29 C.F.R. § 541.603 controlled for the time period between August 23, 2004 and March 3, 2006.  Applying these tests, the Court concluded that certain Plaintiffs were entitled to overtime compensation but only for the three pay periods occurring in November and December, 2005, when actual deductions were taken from Plaintiffs' pay.  The Court did not address the issue of Plaintiff Tina Seals's compensation under the salary level test.

Plaintiffs and Defendant appealed that decision.  The Sixth Circuit reviewed the decision and concluded:

> [T]he Court **AFFIRMS** the district court's decision bifurcating the class period, finding that violations of 29 C.F.R. § 541.602 occurred in November and December of 2005, and limiting § 541.603 overtime compensation to those three pay periods. However, the Court **REVERSES** the district court insofar as it found that the pre-August 23, 2004 compensation plan did not create a substantial likelihood of deductions.  The Court, therefore, concludes that Life Time Fitness is liable for overtime compensation to those Plaintiffs employed and subject to the corporate bonus-pay plan from January 1, 2004 to August 23, 2004.  Finally, the Court **REMANDS** the issue of whether Plaintiff Tina Seals's compensation met the salary level test to the district court for further consideration consistent with this opinion.

(Doc. # 88 at 24) (emphasis in original).

3

### III. Case After Remand

After remand, this Court was presented with two issues to consider before the case was heard as a trial to the court. First, the Court considered the issue of representative testimony and determined that Plaintiffs were permitted to present representative testimony at trial. (Doc. # 98.) Second, the Court considered the claims presented by class member Tina Seals. The Court addressed, initially, whether Seals's salary level test claim was properly before it and, on April 7, 2010, issued an Opinion and Order in which it concluded that it was. (Doc. # 101.) In that decision, the Court directed the parties to file simultaneous briefs addressing the merits of Seals's claim. The Court ultimately determined that Seals was entitled to receive pay for the hours she worked over 20 during the relevant time period. (Docs. # 105, 110.) The Court indicated that Seals would be permitted to present testimony at the bench trial to support her unpaid wages claim.

### IV. Stipulations

The parties entered into three stipulations for trial purposes. (Docs. # 56, 95, 120.) The first was filed on April 19, 2007 and states the following:

1. Life Time Fitness is an employer covered by the FLSA.

2. Plaintiffs' claim is that Defendant's method of compensating Plaintiffs was not consistent with the salary basis test, presently codified at 29 C.F.R. § 541.602, and, thus, Plaintiffs contend that Plaintiffs were not exempt from the overtime provisions of the FLSA during the pay periods falling within the limitations period, and thus are entitled to overtime for hours worked over forty for each week during said limitations period, whatever said limitations period is determined to be. Defendant contends that its pay plan at all times complied with the FLSA and that Plaintiffs are not entitled to overtime for any pay period during their employment with Defendant. In the alternative, Defendant contends that to the extent any Plaintiffs are entitled to overtime, such liability period is limited to the period of time during which actual deductions occurred from Plaintiffs' salaries.

4

3. The salary basis test is explained in 29 C.F.R. § 541.602(a), which provides, in part:

> An employee will be considered to be paid on a "salary basis" within the meaning of these regulations if the employee regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reductions because of variations in the quality or quantity of the work performed.

4. Specifically, Plaintiffs believe that language in certain corporate bonus pay plans which covered them during their employment with Defendant, under which Defendant reserved the right to make deductions from their base salaries to recover for earlier bonus overpayments on a year-to-date basis, and the fact that such deductions were made from eight Plaintiffs as set forth in paragraphs 13 through 16, was inconsistent with the salary basis test.

**Corporate Bonus Pay Plans**

5. Each Plaintiff was compensated under a corporate bonus pay plan for some period of time during which he or she was employed by Defendant during the time period potentially relevant to this lawsuit (February 8, 2003 through March 3, 2006).

6. During the periods of time for which each Plaintiff was covered by a corporate bonus pay plan, he or she generally was paid a pre-determined amount of compensation, identified by Life Time Fitness as base salary, on a semi-monthly basis. In addition to base salary, each Plaintiff was eligible to receive monthly bonus payments based on year-to-date performance according to guidelines set forth in his or her corporate bonus pay plan.

7. The first date any Plaintiff was covered by a corporate bonus pay plan which contained language reserving Defendant's right to make deductions from Plaintiffs' base salaries to recover for earlier bonus overpayments on a year-to-date basis was January 1, 2004. The periods of time each Plaintiff was covered by such corporate bonus pay plans (referred to as "corporate bonus pay plans at issue in this lawsuit") are set forth below in paragraphs 21 through 46.

**2004 Corporate Bonus Pay Plans**

8. Defendant's 2004 corporate bonus pay plans, effective January 1, 2004, covered Plaintiffs employed during 2004 as senior management, Member Activities Department Heads. Around April 1, 2004, the plans were further extended to Life Café Department Heads. The following Plaintiffs were covered by corporate bonus

pay plans for some or all of 2004, as further specified below in paragraphs 21 through 46: Baden-Winterwood, Barge, Brevard, Chaney, Davenport, Galloway, Gregorich, House, Konieczny, Mendez, Nutinsky, and Schroeder.

9. Plaintiffs' 2004 corporate bonus pay plans contained the following language: "If, during the year, YTD EBITDA (*sic*) Before Occupancy $ (*sic*) performance drops below the minimum performance level of 80% of plan, and payments have been made in previous months, then LTF reserves the right to reclaim the amount of the previous payments by reducing future semimonthly guarantee payments."

10. No Plaintiff had his or her base salary reduced in 2004 to recover earlier bonus overpayments.

## 2005 Corporate Bonus Pay Plans

11. Defendant's 2005 corporate bonus pay plans, effective January 1, 2005, covered Plaintiffs employed during 2005 as senior management, Member Activities Department Heads, Life Café Department Heads, and Life Spa Department Heads. The following Plaintiffs were covered by corporate bonus pay plans for some or all of 2005, as further specified below in paragraphs 21 through 46: Baden-Winterwood, Barclay, Barge, Brevard, Chaney, Erdman, Fuss, Galloway, Gregorich, House, Johnson, Lloyd, Mann, McCarthy, Mendez, Nutinsky, Richards, Seals, Visser, Volbrecht, Weiler, West, and Young.

12. Plaintiffs' 2005 corporate bonus pay plans contained the following language: "If, during the year, performance drops to a level such that bonus payments made exceed the amount earned, Life Time Fitness reserves the right to reclaim the amount of the overpayment by reducing future semi-monthly base salary payments."

13. Across three pay dates in November and December 2005—namely, November 9, November 23, and December 9—a total of 8 Plaintiffs had their base salaries reduced to recover some of the amounts of unearned bonus overpayments they had received earlier in the year.

14. Plaintiffs whose base salaries were reduced for the November 9, 2005 pay date were Baden-Winterwood, Barclay, Gregorich, House, and Young.15. Plaintiffs whose base salaries were reduced for the November 23, 2005 pay date were Baden-Winterwood, Erdman, Gregorich, House, and Young.

16. Plaintiffs whose base salaries were reduced for the December 9, 2005 pay date were Baden-Winterwood, Barclay, Erdman, Galloway, Gregorich, House, Mendez, and Young.

6

**2006 Corporate Bonus Pay Plans**

17. Defendant's 2006 corporate bonus pay plans, effective January 1, 2006, applied to the same universe of relevant positions as the 2005 corporate plans. Accordingly, the Plaintiffs employed as Member Activities Department Heads, Life Café Department Heads, and Life Spa Department Heads during some or all of 2006 generally were covered by the 2006 corporate bonus pay plans. These individuals were Baden-Winterwood, Barclay, Erdman, Fuss, Galloway, Gregorich, Lloyd, Mann, McCarthy, Mendez, Visser, Weiler, West, and Young.

18. Effective January 1, 2006, Defendant altered its corporate bonus pay plans to implement a 20% hold back "bank," which Defendant designed to protect the corporation from bonus overpayments on a year-to-date basis. Defendant revised Plaintiffs' 2004 and 2005corporate bonus pay plans to provide that "On a YTD basis if the amount of At Risk Pay or Performance Pay earned is less than the amount paid, Life Time Fitness Inc. reserves the right to reclaim the amount of the overpayment by reducing the 20% monthly hold-back and if necessary future semi-monthly base salary payments. On an annual basis, in no case will the Guarantee Pay be lowered."

19. Following the filing of the instant lawsuit, in recognition of the fact that at least one of its employees believed its corporate bonus pay plans may have violated the FLSA, and as an employee relations measure, Defendant decided to further alter its 2006 corporate bonus pay plans so that any attempts to recover earlier bonus overpayments would be taken only from the 20% hold back bank. On or around March 3, 2006, Defendant issued revised copies of its 2006 corporate bonus pay plans, which Defendant backdated to be effective January 1, 2006, and which contained the following language: "On a YTD basis if the amount of At-Risk Pay or Performance Pay earned is less than the amount paid, Life Time Fitness Inc. reserves the right to reclaim the amount of the overpayment from the banked Performance Pay hold-back. In no case will the Guaranteed Pay be reduced."

20. None of the Plaintiffs had his or her base salary reduced at any point during 2006 to recover earlier bonus overpayments.

**Facts Relevant to Individual Plaintiffs' Claims**

21. Amy Baden-Winterwood has been employed by Life Time Fitness as a Member Activities Department Head from July 1, 1999 through the present. She was covered by a corporate bonus pay plan at issue in this lawsuit from January 1, 2004 through March 3, 2006.

22. Jennifer Barclay was employed by Life Time Fitness as a Life Café Department Head from June 1, 2005 through January 15, 2006. She was covered by a corporate

bonus pay plan at issue in this lawsuit from June 1, 2005 through January 15, 2006.

23. Victor Barge was employed by Life Time Fitness as a Director-Project Management Organization from July 6, 2004 through September 1, 2005. He was covered by a corporate bonus pay plan at issue in this lawsuit from July 6, 2004 through September 1, 2005.

24. Kristina Brevard was employed by Life Time Fitness as a Member Activities Department Head from April 30, 2004 through August 31, 2005. She was covered by a corporate bonus pay plan at issue in this lawsuit from April 30, 2004 through August 31, 2005.

25. Teresa Chaney was employed by Life Time Fitness from approximately August 1, 1999 through August 2, 2005. She was employed as a Member Activities Department Head during the period from February 8, 2003 through August 2, 2005. She was covered by a corporate bonus pay plan at issue in this lawsuit from January 1, 2004 through August 2, 2005.

26. Elizabeth (Campbell) Davenport was employed by Life Time Fitness as a Member Activities Department Head from October 15, 2002 through February 14, 2004. She was covered by a corporate bonus pay plan at issue in this lawsuit from January 1, 2004 through February 14, 2004.

27. Sarah (Swearman) Erdman has been employed by Life Time Fitness from approximately April 9, 2003 through the present. She was employed as a Life Spa Department Head from June 1, 2005 through January 31, 2006. She was covered by a corporate bonus pay plan at issue in this lawsuit from June 1, 2005 through January 31, 2006.

28. Meghan Fuss was employed by Life Time Fitness from approximately April 2004 through March 1, 2006. She was employed as a Life Spa Department Head from July 16, 2005 through March 1, 2006. She was covered by a corporate bonus pay plan at issue in this lawsuit from July 16, 2005 through March 1, 2006.

29. Judith Galloway has been employed by Life Time Fitness as a Life Café Department Head from December 2, 2003 through the present. She was covered by a corporate bonus pay plan at issue in this lawsuit from April 1, 2004 through March 3, 2006.

30. Lisa Gregorich was employed by Life Time Fitness from approximately September 2003 through February 15, 2006. She was employed as a Member Activities Department Head from December 16, 2003 through February 15, 2006. She was covered by a corporate bonus pay plan at issue in this lawsuit from January 1, 2004 through February 15, 2006.

31. Jamie House has been employed by Life Time Fitness from January 21, 1999 through the present. She was employed as a Member Activities Department Head from January 21, 1999 through approximately November 16, 2005. She was covered by a corporate bonus payplan at issue in this lawsuit from January 1, 2004 through approximately November 16, 2005, when she became an hourly Member Activities Instructor.

32. Chrisondra Johnson was employed by Life Time Fitness from September 15, 2004 through October 15, 2005. She was employed as a Life Spa Department Head from February 1, 2005 through October 15, 2005; however, she went on unpaid leave on August 8, 2005, and performed no work thereafter. She was covered by a corporate bonus pay plan at issue in this lawsuit from February 1, 2005 through October 15, 2005.

33. Scott Konieczny was employed by Life Time Fitness as a Life Café Department Head from October 24, 2002 through October 1, 2004. He was covered by a corporate bonus pay plan at issue in this lawsuit April 1, 2004 through October 1, 2004.

34. Jacob Lloyd was employed by Life Time Fitness as a Life Spa Department Head from June 16, 2005 through February 15, 2006. He was covered by a corporate bonus pay plan at issue in this lawsuit from June 16, 2005 through February 15, 2006.

35. Christopher Mann has been employed by Life Time Fitness as a Life Café Department Head from March 1, 2005 through the present. He was covered by a corporate bonus pay plan at issue in this lawsuit from March 1, 2005 through March 3, 2006.

36. Jennifer McCarthy has been employed by Life Time Fitness as a Life Spa Department Head from July 7, 2003 through the present. She was covered by a corporate bonus pay plan at issue in this lawsuit from January 1, 2005 through March 3, 2006.

37. Angela Mendez has been employed by Life Time Fitness as a Life Café Department Head from May 13, 2002 through the present. She was covered by a corporate bonus pay plan at issue in this lawsuit from April 1, 2004 through March 3, 2006.

38. Robert Nutinsky was employed by Life Time Fitness from approximately December 2, 2003 to June 15, 2006. He was employed as a Member Activities Department Head from March 1, 2004 through April 30, 2005. He was covered by a corporate bonus pay plan at issue in this lawsuit from March 1, 2004 through April 30, 2005.

9

39. Marcia Richards was employed by Life Time Fitness as a Life Spa Department Head from approximately September 28, 1999 through January 1, 2006. She was covered by a corporate bonus pay plan at issue in this lawsuit from January 1, 2005 through January 1, 2006.

40. Andrea Schroeder was employed by Life Time Fitness as a Member Activities Department Head from March 29, 2004 through September 2, 2004. She was covered by a corporate bonus pay plan at issue in this lawsuit from March 29, 2004 through September 2, 2004.

41. Tina Seals was employed by Life Time Fitness at various times from approximately January 12, 1999 through October 24, 2005. She was employed as a Member Activities Department Head from August 1, 2005 through October 24, 2005. She was covered by a corporate bonus pay plan at issue in this lawsuit from August 1, 2005 through October 24, 2005.

42. Bridgett Visser (now Ipema) was employed by Life Time Fitness from approximately August 15, 2001 until July 21, 2006. She was employed as a Member Activities Department Head from January 1, 2005 through July 21, 2006. She was covered by a corporate bonus pay plan at issue in this lawsuit from January 1, 2005 through July 21, 2006.

43. Aaron Volbrecht was employed by Life Time Fitness from approximately November 16, 2000 until August 1, 2005. He was employed as a salaried Sales Manager from March 1, 2005 through August 1, 2005. He was covered by a corporate bonus pay plan at issue in this lawsuit from March 1, 2005 through August 1, 2005.

44. Elizabeth (Venezia) Weiler has been employed by Life Time Fitness from approximately September 29, 2004 through the present. She was employed as a Life Spa Department Head from May 1, 2005 through July 5, 2006. She was covered by a corporate bonus pay plan at issue in this lawsuit from May 1, 2005 through July 5, 2006.

45. Theresa West was employed by Life Time Fitness at various times from approximately May 8, 2000 through February 17, 2007. She was employed as a Life Spa Department Head from July 1, 2005 through July 31, 2006. She was covered by a corporate bonus pay plan at issue in this lawsuit from July 1, 2005 through July 31, 2006.

46. Beth Ann Young (now Bird) was employed by Life Time Fitness as a Member Activities Department Head from February 7, 2005 through January 17, 2006. She was covered by a corporate bonus pay plan at issue in this lawsuit from February 7, 2005 through January 17, 2006.

(Doc. # 56) (emphases in original).

On January 18, 2010, the parties entered their second stipulation containing the following:

1. The statute of limitations for this action shall be two years for all Plaintiffs with the exception of Plaintiff Davenport who may seek to recover .5 times any awarded overtime damages for the 6 weeks she worked from January 1 through February 14, 2004 (even though that entire period falls outside the agreed-upon limitations period). The effect of this agreement on the statute of limitations for the remaining Plaintiffs, considered alongside each Plaintiff's opt-in date and the Court's previous order for tolling, is as follows:

A.) Plaintiff Baden-Winterwood may seek overtime damages for the weeks ordered by the Sixth Circuit as far back as February 8, 2004;

B.) Plaintiffs Barclay, Barge, Brevard, Erdman, Fuss, Galloway, Gregorich, House, Konieczny, Lloyd, Mann, McCarthy, Mendez, Nutinsky, Richards, Schroeder, Weiler, West, and Young (now known as Bird) may seek overtime damages for the weeks ordered by the Sixth Circuit as far back as May 16, 2004;

C.) Plaintiffs Chaney and Visser (now known as Ipema) may seek overtime damages for the weeks ordered by the Sixth Circuit as far back as May 31, 2004.

D.) Should this Court decide Plaintiff Tina Seals may proceed on her claims, she may seek any proven damages as far back as May 16, 2004.

E.) The method of calculating overtime (the "multiplier" issue) shall be the method adopted by the Court in *Gregorich v. Life Time Fitness*, Case No. 07 CH 9793, Circuit Court of Cook County, Illinois, Order dated March 25, 2009 *to wit*: hours Plaintiffs worked including and between 41 and 46 shall be calculated at .5 their regular rate, and hours worked over 46 shall be calculated at 1.5 their regular rate. The regular rate shall be determined by each Plaintiff's: remuneration in the time period / number of weeks worked in the time period / weekly hours salary was intended to compensate (20 for Plaintiff Tina Seals; 46 for the remaining Plaintiffs).

2. To account for the parties' agreement relative to liquidated damages, Plaintiffs' total overtime damages shall equal 1.7 times the amount of any established overtime

damages.

3. The agreements made herein are made solely for purposes of settling various issues in this litigation, and shall not be construed as an admission by either party or prejudice either party's appellate rights in any other litigation.

(Doc. # 95.)

On June 18, 2010, the parties entered their third stipulation, which specifically

incorporated the previous two for trial purposes.  That stipulation provided:

1. The parties' April 19, 2007 stipulation (Doc. # 56) is part of the record for trial.

2. The parties' January 18, 2010 stipulation (Doc. # 95) is part of the record for trial.

3. The parties agree that the subsequent paragraphs constitute certain additional undisputed facts that are part of the record for trial.

4. Applying the parties' previous stipulation (Doc. # 95) on the statute of limitations, the effect of tolling, and each plaintiff's opt-in dates, the time periods for which the plaintiff class members can seek overtime damages is as set forth below.

5. Applying the parties' previous agreement on the method of calculating overtime (see Doc. # 95), each plaintiff class member's regular rate of pay for purposes of said calculation is as set forth below.

6. The information set forth below regarding the paid time off ("PTO") taken by the plaintiff class members is derived from pay stubs that have been produced in this litigation.  These figures are included herein so the parties and the Court are not burdened by the review and introduction of pages and pages of pay stubs. However, this does not preclude Defendant from introducing at trial additional evidence of other PTO or other leave taken by plaintiff class members.

**Director- PMO**

A.) Plaintiff Barge may seek overtime damages for work performed from July 6, 2004 through August 23, 2004. Plaintiff Barge's regular rate is $49.82.

**Member Activities Department Heads**

A.) Plaintiff Baden-Winterwood may seek overtime damages for work performed from February 8, 2004 through August 23, 2004.

12

Plaintiff Baden-Winterwood's regular rate is $17.55 for this time period. Her pay stubs reflect the following PTO was taken during this time period: 16 hours during the time period from April 1, 2004 through April 15, 2004 (LTF 000063); 8 hours during the time period April 16, 2004 through April 30, 2004 (LTF 0000064); 16 hours during the time period from May 1, 2004 through May 15, 2004 (LTF 000065); 40 hours from May 16, 2004 through May 31, 2004 (LTF 000066); and 32 hours from August 1, 2004 through August 15, 2004 (LTF 000071). Plaintiff Baden-Winterwood may also seek overtime damages for work performed from October 16, 2005 through November 30, 2005. Plaintiff Baden-Winterwood's regular rate is $12.68 for this time period. Her pay stubs reflect the following PTO was taken during this time period: 8 hours during the time period from November 16, 2005 through November 30, 2005 (LTF 000107).

B.) Plaintiff Brevard may seek overtime damages for work performed from May 16, 2004 through August 23, 2004. Plaintiff Brevard's regular rate is $15.92.

C.) Plaintiff (Young) Bird may seek overtime damages for work performed from October 16, 2005 through November 30, 2005. Plaintiff Bird's regular rate is $11.86.

D.) Plaintiff Chaney may seek overtime damages for work performed from May 31, 2004 through August 23, 2004. Plaintiff Chaney's regular rate is $18.45. Her pay stubs reflect the following PTO was taken during this time period: 40 hours during the time period from July 16, 2004 through July 31, 2004 (LTF 000371).

E.) Plaintiff Davenport may seek overtime damages for work performed from January 26, 2004 through February 14, 2004. Plaintiff Davenport's regular rate is $13.59.

F.) Plaintiff Gregorich may seek overtime damages for work performed from May 16, 2004 through August 23, 2004. Plaintiff Gregorich's regular rate is $24.65 for this time period. Plaintiff Gregorich may also seek overtime damages for work performed from October 16, 2005 through November 30, 2005. Plaintiff Gregorich's regular rate is $20.75 for this time period.

G.) Plaintiff House may seek overtime damages for work performed from May 16, 2004 through August 23, 2004. Plaintiff House's regular rate is $16.18 for this time period. Plaintiff House may also

seek overtime damages for work performed from October 16, 2005 through November 16, 2005. Plaintiff House's regular rate is $12.73 for this time period.

H.) Plaintiff Ipema (fka Visser) may seek overtime damages for work performed from October 16, 2005 through November 30, 2005. Plaintiff Ipema's regular rate is $14.73. Her pay stubs reflect the following PTO was taken during this time period: 24 hours during the time period from November 16, 2005 through November 30, 2005 (LTF 001999).

I.) Plaintiff Nutinsky may seek overtime damages for work performed from May 16, 2004 through August 23, 2004. Plaintiff Nutinsky's regular rate is $11.96. His pay stubs reflect the following PTO was taken during this time period: 16 hours during the time period from May 1, 2004 through May 15, 2004 (LTF 001629); and 30 hours during the time period from August 1, 2004 through August 15, 2004 (LTF 001635).

J.) Plaintiff Schroeder may seek overtime damages for work performed from May 16, 2004 through August 23, 2004. Plaintiff Schroeder's regular rate is $13.98.

K.) Plaintiff Seals may seek unpaid wages and overtime damages for work performed from August 1, 2005 through October 24, 2005. Plaintiff Seals's regular rate is $13.38. In making the stipulation with respect to Ms. Seals, Life Time Fitness is not waiving any right to appeal the Court's decision (Doc. #s 105 and 110) with respect to Ms. Seals' entitlement to unpaid wages or overtime damages.

## Life Café Department Heads

A.) Plaintiffs claim that Plaintiff Barclay may seek overtime damages for work performed from October 16, 2005 through November 30, 2005. Plaintiff Barclay's regular rate is $13.89. Defendant disagrees that Plaintiff Barclay may seek any overtime damages whatsoever because she failed to respond to Defendant's discovery requests served November 30, 2006 and otherwise has failed to provide any evidence of the hours she alleges to have worked.

B.) Plaintiff Galloway may seek overtime damages for work performed from May 16, 2004 through August 23, 2004. Plaintiff Galloway's regular rate is $19.57 for this time period. Plaintiff Galloway may also seek to recover overtime damages for work

performed from October 16, 2005 through November 30, 2005. Plaintiff Galloway's regular rate is $21.83 for this time period.

C.) Plaintiff Konieczny may seek overtime damages for work performed from May 16, 2004 through August 23, 2004. Plaintiff Konieczny's regular rate is $23.09 for this time period.

D.) Plaintiff Mann may seek overtime damages for work performed from October 16, 2005 through November 30, 2005. Plaintiff Mann's regular rate is $26.95 for this time period.

E.) Plaintiff Mendez may seek overtime damages for work performed from May 16, 2004 through August 23, 2004. Plaintiff Mendez's regular rate is $15.97 for this time period.  Her pay stubs reflect the following PTO was taken during this time period: 72 hours during the time period from August 1, 2004 through August 15, 2004 (LTF 001519).  Plaintiff Mendez may also seek overtime damages for work performed from October 16, 2005 through November 30, 2005. Plaintiff Mendez's rate is $15.85 for this time period.

**Life Spa Department Heads**

A.) Plaintiff Erdman may seek overtime damages for work performed from October 16, 2005 through November 30, 2005. Plaintiff Erdman's regular rate is $17.34.

B.) Plaintiff Fuss may seek overtime damages for work performed from October 16, 2005 through November 30, 2005.  Plaintiff Fuss's regular rate is $18.87.

C.) Plaintiff Lloyd may seek overtime damages for work performed from October 16, 2005 through November 30, 2005. Plaintiff Lloyd's regular rate is $16.30.  His pay stubs reflect the following PTO was taken during this time period: 8 hours during the time period from November 1, 2005 through November 15, 2005 (LTF 001205).

D.) Plaintiff McCarthy may seek overtime damages for work performed from October 16, 2005 through November 30, 2005. Plaintiff McCarthy's regular rate is $21.31. Her pay stubs reflect the following PTO was taken during this time period: 32 hours during the time period from November 16, 2005 through November 30, 2005 (LTF 001393).

E.) Plaintiff Richards may seek overtime damages for work

15

performed from October 16, 2005 through November 30, 2005. Plaintiff Richard's regular rate is $27.76.

F.) Plaintiff Weiler may seek overtime damages for work performed from October 16, 2005 through November 30, 2005. Plaintiff Weiler's regular rate is $18.06.

G.) Plaintiff West may seek overtime damages for work performed from October 16, 2005 through November 30, 2005. Plaintiff West's regular rate is $27.94.

7. The parties agree that the foregoing stipulations may be used for purposes of this litigation and this litigation only.

(Doc. # 119) (emphases in original).

## V.  Bench Trial

The parties presented two issues at trial.  First, whether the testimony of the testifying plaintiffs was representative of the nontestifying plaintiffs.  Second, the amount of unpaid wages, if any, Plaintiffs were due.

## A.  Witness Summaries

At the bench trial, Plaintiffs presented testimony from six witnesses on behalf of themselves and as representatives of nontestifying class members:  two Member Activities Department Heads, Amy Baden-Winterwood and Teresa Chaney; two Life Spa Department Heads, Jennifer McCarthy and Marcia Richards; and, two Life Café Department Heads, Scott Konieczny and Judith Galloway.  Plaintiffs also presented as witnesses the Director of PMO Victor Barge and part-time Member Activities Department Head Tina Seals.  Defendant presented testimony from two management employees, Kevin Logan and Doug Ringeisen.  A summary of each witness follows.

16

### 1. **Plaintiff Victor Barge**

The first witness called by Plaintiffs was Victor Barge who testified via video-conference. Barge worked at LTF as the Director of PMO from July 6, 2004 until September 1, 2005. Barge stated that it had been stipulated that for purposes of this proceeding the period in dispute is from July 6, 2004 through August 23, 2004. Barge testified that he managed projects with the information technology department at multiple LTF facilities as well as its corporate offices. Barge's location of employment was the corporate office in Minnesota.

Barge was not required to punch a time clock at work. There were no minimum or maximum hour requirements for his position, Barge claimed he worked as much as necessary to accomplish his duties. He estimated that during the period in dispute he worked between 45 and 60 hours a week, an estimate that did not include breaks for lunch. He was not paid overtime during this period. Barge testified that he typically worked Monday through Friday from 8 a.m. or 9 a.m. until 5 p.m., that he sometimes worked nights and weekends, and that it was common for him to log in to his work computer and take calls from home both before and after work. He also testified that the work he did could not have been delegated to someone else. Barge stated that neither Kevin Logan or Doug Ringeisen would have personal knowledge of the hours he worked.

On cross-examination, Barge testified that he got along with his supervisor, Brent Zempel, most of the time. Barge said that he believed he was efficient and diligent in performing his duties. Barge testified that he would either eat lunch at his desk or take an hour break and go out for lunch. He further testified that once a week, for an hour to an hour and one-half, he would take a break to workout at a LTF facility. Barge testified that he did not rely on

any documents to come up with the estimation of the amount of hours that he worked during the relevant time period, thus he was unable to recall precisely how many hours he worked in a given week.  He testified that he was "pretty positive" he never worked fewer than 45 hours in a week.

On redirect examination, Barge clarified again that his lunch and workout breaks were not included in his estimate of the amount of hours he worked during the relevant time period.

### 2. Plaintiff Teresa Chaney

Teresa Chaney was the second witness called by Plaintiffs.  On direct and redirect examination, she testified to the following.  She was employed by LTF from 1999 until August 2, 2005 at its club in Novi, Michigan.  The parties stipulated that the relevant time period for her employment was May 31, 2004 through August 23, 2004.  Chaney testified about her daily, weekly, and monthly job duties as the Member Activities Department Head during the relevant time period.  Her daily duties included supervision of all member activities classes, hiring and training instructors, scheduling, tracking employees' hours, and processing daily payments made to LTF, and payroll.  Additionally, Chaney completed a daily walkthrough check of the member activities area of the club.  Chaney's weekly tasks included turning in objectives and attending General Managers' and Department Heads' meetings.  On a monthly basis, Chaney reconciled the department budget and processed payroll, and she met with all Michigan Member Activities Department Heads.  Chaney also coordinated special events for the club, including birthday parties, a "daddy-daughter" dance, a Halloween event, and an open house to promote summer camp.  Chaney testified that she was on call 24 hours per day, 7 days per week to substitute for instructors or other staff who called off work.  Chaney testified that she averaged between 50

18

and 60 hours of work per week during the relevant time period, including her regular duties and supervision of summer camp Monday through Friday from 7:00 a.m. until 6:00 p.m.  She did not include lunch or other breaks in her calculations.

On cross examination, Chaney testified that she did not know the square footage of the club, the number of club members, the percent of capacity at which the club operated, the average number of daily member card "swipes," the penetration rate for her area of the club, or the square footage of her department.  Chaney testified that she decided what her own daily schedule would be and that her tasks varied from day to day.  Chaney also testified that she could not exactly recreate the hours she worked during the relevant time period, nor did anyone record her hours, but she recalled that she did take a one week vacation during the relevant time period.  Member Activities Department Heads at other LTF clubs, Chaney said, likely worked hours within the range she specified, but she could not provide direct evidence for that comparison aside from LTF's Standard Operating Procedures ("SOP").  She agreed that member activity programming varied from club to club and that she made no visits to other LTF clubs during the relevant time period.  Chaney also said that the size of the department and number of staff to supervise might affect hours for Member Activities Department Heads at other clubs, but the clubs' square footage, number of members, or number of swipes would not create a direct impact.

### 3.  Plaintiff Scott Konieczny

Scott Konieczny was the third witness called by Plaintiffs.  On direct examination Konieczny testified that he worked at LTF from April 2002 through October 2004 as a Life Café Department Head at the Algonquin, Illinois club for six months and at the Warrenville, Illinois

19

club the remaining time.  Konieczny testified on direct examination that he ran the café as if it were his own business.  Konieczny stated that he was required to follow LTF policy in food preparation and in the appearance of the restaurant.  He was responsible for managing the staff, for all of the hiring, training, paperwork, and purchasing for the café.  He testified that he might have been able to delegate some of these duties, but he did not delegate anything that could reflect on the cafe's bottom line.  Konieczny testified that he was required to attend monthly meetings with other Life Café Department Heads.  He also was responsible for payroll and daily bank deposits, which he took to the bank.  He further stated that he was responsible for all managerial duties related to the summer bistro, which is another café within the club attached to the outside pool area.  The summer bistro is usually open from Memorial Day until Labor Day.  Last, whenever the employee scheduled to open or close the café was absent, Konieczny was required to go to work to complete their duties.

Konieczny testified that at the beginning of his employment, the Director of Café Operations told him that his position required between 45 to 55 hours of work per week.  LTF did not keep any records of Konieczny's hours; he made his own schedule, and typically worked between 50 and 60 hours per week.  Konieczny testified that he took two days off work in July 2004 for the birth of his son.  He usually worked through his lunch time, eating while he was either at work or on call to work.  He testified that he was available to work 24 hours a day, seven days a week.  He said the clubs at Warrenville and Algonquin both had around 14,000 members.  He testified that did not know Kevin Logan or Doug Ringeisen and said they would not personally know how many hours he worked.  Last, he testified that individuals with similar

duties at other clubs were, or should have been, working between 50 and 60 hours a week as well.

On cross-examination, Konieczny acknowledged that the period in dispute for purposes of this proceeding is from May 16, 2004 through August 23, 2004.  He stated that during this period he came into work on Monday through Friday between 7 a.m. and 7:30 a.m. and worked until between 5 p.m. to 6 p.m.  Konieczny testified that he became more skilled and efficient the longer he worked as a Life Café Department Head, but he did not believe that being more skilled and efficient would not significantly decrease the number of hours necessary to accomplish a Life Café Department Head's duties.  Konieczny testified he was not familiar with the work habits of Christopher Mann, Angela Mendez, or Jennifer Barclay.

There was no redirect examination of Konieczny.

### 4. Plaintiff Tina Seals

The fourth witness called by Plaintiffs was Tina Seals, who worked for LTF at its Champlin, Minnesota location from August 1998 until August or October 24, 2005.  The parties stipulated that the relevant time period for her was August 1, 2005 through October 24, 2005. Seals testified on direct and redirect examination that she held the position of Summer Camp Lead Counselor until the first week of September 2005, thereafter she was a Members Activities Department Head.  Seals's duties as a Members Activities Department Head included supervising and scheduling all member activities classes and staff, payroll, promoting classes within the club and to the community, responding to voicemails and emails, participating in weekly and monthly meetings, and ensuring that the department stayed within its budget and met monthly goals.  Seals was a part-time employee in her role as Members Activities Department

Head, and her supervisor, Justin Sortman, scheduled her hours in four hour daily blocks.  Seals testified that despite her scheduled hours she averaged between 50 and 60 hours per week during summer camp and between 30 and 40 hours per week otherwise.

On cross-examination, Seals testified that although she did not always complete her duties on the day that they should have been completed, over the course of a normal week she completed all of her basic duties within a 30 to 40 hour work week.  Seals testified that she could have done a better job and met the club's goals for her if she had worked between 50 and 60 hours each week.  Seals did not recall the exact hours she worked during the relevant time period, and no one kept track of her actual hours, but she consulted her pay stubs for the relevant time period to determine the days she worked and the hours for which she was paid.

### 5.  Plaintiff Amy Baden-Winterwood

Amy Baden-Winterwood was the fifth witness called by Plaintiffs.  She was employed by LTF from July 1999 through February 2009 as a Member Activities Department Head in the Columbus, Ohio Easton location.  Baden-Winterwood testified that her role as a Department Head included the following: preparing monthly business plans with goals and objectives; recruiting, hiring, training, evaluating, and firing a staff of up to 35 part-time employees; maintaining the member activities budget; responding to email and voicemail inquiries usually within the hour but always within the company policy of 24 hours; developing, promoting, and recruiting participants for programs such as belly dancing and "scootercize"; and attending and participating in one-on-one meetings, weekly meetings, various regional meetings, and national meetings in person and via conference calls.  In addition to these job specific tasks, the witness testified that all employees were encouraged and required to engage in customer service, to get

to know clients and to develop a relationship with them, taking much time away from other job duties as necessary.

Baden-Winterwood stated that she interacted with other Member Activities Department Heads via the various meetings she attended.  In those meetings, the Member Activities Department Heads would discuss how to grow the department, how to maintain the budget, how to run programs, various corporate expectations, and corporate philosophies.  She testified that the corporate philosophy was one similar to McDonald's.  Just as one could purchase the same hamburger from a McDonald's in Texas or a McDonald's in Maine, one should experience the same atmosphere in each LTF facility.

The number of hours per week Baden-Winterwood worked depended on the season. From January through May, she worked from 9:00 a.m. to 6:00 p.m. or to 8:00 p.m. Monday through Thursday and from 9:00 a.m. to 4:00 p.m. on Fridays.  Saturday hours during those months were from 8:00 a.m. to 1:00 p.m. or 9:00 a.m. to 2:00 p.m.  During the summer months the witness testified she worked from 7:00 a.m. to 6:00 p.m., or when the last summer camper left.  Baden-Winterwood testified that she would be on call at all times, 24 hours a day, seven days a week; available by telephone for any need that might arise when she was not physically in the club.

The SOP for Member Activities Department Heads, distributed by LTF, stated 46 minimum hours should be worked per week.  Baden-Winterwood stated that Member Activities Department Heads were expected to work beyond the 46 hours suggested by the SOP.  She was expected to word as long it took to complete the required tasks.  She created her scheduled hours and posted the hours for other employees to view.  Baden-Winterwood estimated that during the

high traffic time of January through the summer, and during the relevant time period of February 8, 2004 through August 23, 2004, she worked 45 to 60 hours per week.  That time also included a three day white-water rafting trip she coordinated and lead.  Her hours during the relevant time period were 8:30 a.m. or 9:00 a.m. Monday through Friday until 6:00 p.m., and rotating Saturday shifts 8:00 a.m. until 12:00 p.m. or 9:00 a.m. until 1:00 p.m. or 2:00 p.m. once or twice per month.  She stated that during the October 16, 2005 through November 30, 2005 time period she worked about 45 to 55 hours per week, Monday through Thursday 9:00 a.m. to 6:00 p.m. and Fridays and Saturdays from 9:00 a.m. to 2:00 p.m. or to 4:00 p.m.  Baden-Winterwood stated she could not do her job in 40 hours per week and that she was expected to work at least 46 hours per week.

Baden-Winterwood testified she occasionally observed Member Activities Department Heads in other clubs in Michigan, Minnesota, Indiana, and in Ohio at the Cincinnati and Sawmill clubs.  She helped and worked with the new manager in Cincinnati, Ohio.  She went to Indiana to evaluate a manager there.  She went to Michigan for meetings and took her son to camp there. Baden-Winterwood stated that all of the other Member Activities Department Heads with whom she interacted had the same job responsibilities and would likewise not be able to complete their jobs within 40 hours per week but rather likely worked similar hours to herself, 45 to 55 hours in the fall and 45 to 60 hours from January through the summer months.

On cross-examination, Baden-Winterwood testified that during the relevant time periods the square footage of the Easton club was 98,000 square feet.  She did not know at what percentage of capacity the club was, but did believe the membership level during the relevant times was about 8,000 to 8,500.

24

Baden-Winterwood testified that she was not physically at the facility during all the hours that the member activities department was open. In addition, she trained other employees on how to complete some of her responsibilities.

Comparing herself to other Member Activities Department Heads, Baden-Winterwood testified she was at a high skill level and high efficiency level and that other Department Heads' skill levels may vary from hers. The witness did not believe the level of skill or efficiency a Department Head might have would reduce the hours required to work to complete his or her job each week.

Baden-Winterwood testified that she created her schedule and that she, more or less, worked the hours scheduled. She stated that she was the best source of knowledge of her work hours. The witness also stated that she did not work out during her scheduled shift nor did she take lunch breaks. After implementation of the SOP, the witness said she felt more accountable for her hours because she was required to take an annual test based upon the SOP, but she believed her actual hours worked did not change. She estimated the hours worked based upon the fact that she created her own schedule for the ten years she worked at LTF, but did not have a specific schedule to prepare for her testimony.

Continuing on cross-examination, the witness testified that when she visited clubs in Michigan and Minnesota she did not observe a Member Activities Department Head for an entire day completing their job duties. She did observe at the Sawmill and Cincinnati clubs for a full day, however. She testified that she observed the Indiana Member Activities Manager for about four or five hours. Baden-Winterwood testified that she did not have first-hand knowledge of any of the other Member Activities Department Heads actual hours worked per week.

25

On redirect examination, Baden-Winterwood testified that the test she was given covering the contents of the SOP was given to all Members Activities Heads across the country. The witness also clarified that the work camping trip was taken in July 2004.

### 6. Plaintiff Judith Galloway

The sixth witness called by Plaintiffs was Judith Galloway.  She was employed by LTF at its Algonquin, Illinois location from April 2003 though August 2003, and again from December 2003 though April 2009.  During the first period of employment she worked as an Assistant Life Café Department Head, and during the subsequent employment period she worked as the Life Café Department Head.  The Algonquin location operates both a café inside the facility and an outdoor bistro near the pool during the summer and early autumn months.

Galloway's responsibilities included managing the café and bistro as if they were her own businesses; interviewing, hiring, training, and firing other café department employees; payroll; creating work schedules; managing inventory of the café; invoicing; marketing, and managing promotions for the café; processing credit card sales and making deposits to the bank; maintaining an appropriate level of cleanliness; and creating and maintaining personal relationships with LTF members.  Galloway indicated that she was unable to delegate most of her duties due to management's expectation that she perform those duties herself.

Galloway testified that the SOP stated that the Life Café Department Heads were expected to work 45 hours per week.  Each Life Café Department Head received the same SOP, and was expected to work the same amount of hours per week.  Galloway testified that all Department Heads were expected to work extra hours if necessary to carry out their duties.  She stated that she scheduled herself the required 55 hours each week, and identified schedules that

26

she produced from approximately 2004 through 2006 that reflected those hours.  Despite being scheduled for 55 hours per week, Galloway testified that she worked more because some of her duties were very time-consuming and because she attempted to maintain her budget by working shifts that could be covered by a subordinate.  Each Life Café Department Head was assigned a target percentage of their budget for payroll, and by performing certain duties herself instead of scheduling an hourly employee to do them, Galloway was better able to stay within her target payroll percentage.

The time periods at issue in this case with regards to Galloway are May 16, 2004 through August 23, 2004, and October 16, 2005 through November 30, 2005.  During those periods, Galloway testified that she worked on average from 60 to 80 hours per week.  She testified that she worked so much during the relevant 2004 time period because it was her first bistro season and she was required to learn how to use the equipment and manage both the café and the bistro at the same time.  With regard to the relevant 2005 time period, she testified that even though the bistro was closed for the year, she worked so many hours because she was collaborating with other departments on holiday and charitable projects.  Galloway stated that during other time periods of employment, she still worked at least 70 hours per week.  The work time estimated by Galloway does not include break time; she stated that she was not really able to take breaks because she was too busy working.

Galloway testified that she interacted with Department Heads from other club locations during monthly meetings, weekly conference calls, and occasional visits to other clubs.  Based upon her experience, her interactions with others, and the expectations of LTF management, she stated that she did not believe that a Life Café Department Head could perform all of the duties

27

in a 40 hour work week.  She stated that it is likely that other Life Café Department Heads would have to work hours similar to hers in order to complete their jobs

On cross-examination, Defendant's attorney asked Galloway about the SOP that was introduced into evidence by Plaintiffs' counsel (Plaintiffs' Exhibit 3).  Galloway testified that she remembered her SOP stating that 55 hours of work per week was expected.

Galloway testified that she believed that other Department Heads operated with varying degrees of skill, efficiency, and experience.  She disagreed with the assertion that this would lead to a variance in hours necessary for other Department Heads to complete their jobs.

Galloway stated that she may have occasionally taken a lunch break during the relevant time periods, but only when her General Manager took her and other LTF employees to lunch. Galloway has six children, all of whom lived with her during the relevant time period.  She testified that she did not generally have to leave work to tend to their issues because her husband took care of the children while she was working.  She stated that while there may have been an occasional problem for which she had to leave work, she could not remember if any occurred during the relevant time periods.

Galloway was shown her interrogatory answers, in which she indicated that she worked on average between 60 and 80 hours per week, and her deposition testimony from a companion case before a court in another state that indicated that she worked between 55 and 60. (Plaintiffs' Exhibit 9.)  Galloway explained that she would schedule herself 55 to 60 hours per week in a normal week, but that no week was ever normal and she always worked between 60 and 80 hours per week.  Defense counsel also pointed to another part of Galloway's deposition

in which she stated that she worked on average between 55 and 60 hours per week. Finally, at one point Galloway testified that she worked between 35 to 60 hours per week.

On redirect, Galloway testified that her statement about working 35 to 60 hour per week was in reference to a time period in 2008 after she realized that she was not going to get the promotion for which she had been hoping, and was less motivated to perform up to her previous standards. Galloway is not seeking overtime for any work performed during 2008.

**7. Plaintiff Jennifer McCarthy**

Jennifer McCarthy was the seventh witness called by Plaintiffs. On direct and redirect examination, McCarthy testified to the following. She worked for LTF from June 2003 until July 2007. During the majority of her tenure she was a Life Spa Department Head. In this role she was in charge of hiring and firing employees, marketing, inventory, and ordering products and supplies. She was also responsible for implementing the directions in the SOP. McCarthy testified that she usually worked from 9 a.m. to 9 p.m. and also on Saturdays and Sundays.

McCarthy stated that the time period of her employment relevant to this proceeding is October 16, 2005 through November 30, 2005. During the first half of this period McCarthy worked at the Fairfax, Virginia facility and during the second half she worked at the Centerville, Virginia facility. McCarthy testified that she believed that the number of members that belonged to an LTF club had little relevance to the amount of business for the spa. McCarthy testified that she was expected to work a minimum of 45 hours and as many hours as it took to get her job done. She made a schedule of her hours at the beginning of the week and changed it whenever she worked different hours than she was scheduled. She read from her schedule which is marked as Plaintiffs' Exhibit 6. This schedule listed her as working 63, 63, 63, 56, 58, 22, and 36 hours

per week during the relevant time period.  McCarthy testified that the last two weeks were

shorter because they were during the Thanksgiving holiday.

On cross-examination, McCarthy testified that she never took lunch breaks and that the

hours listed on her schedule were accurate.  She also stated that she never took a break to

workout.  She testified that all of the clubs operated similarly; not because they were all

managed by her, but because that was the business model that LTF tried to create by adopting

the SOP.

### 8.  Plaintiff Marcia Richards

As their eighth witness, Plaintiffs called Marcia Richards, who testified that she was

employed with LTF from July 1999 through January 2006 and was a Life Spa Department Head

from 2002 until 2006 at the Novi, Michigan and Commerce, Michigan clubs.  The Spa

Department is a full service salon for hair and skin care, body treatments, massage, and retail

products that is open to members and non-members.

Richards stated that her job responsibilities included the following: recruiting and hiring

spa staff; training the spa commissioned employees and spa front desk hourly employees on the

SOP; financial duties such as budget, payroll, and inventory; ordering inventory and conducting

inventory counts; attending meetings in person and via conference calls; and responding to email

and voicemail inquiries.  Regarding meetings, Richards testified that she engaged in monthly

regional calls with spa managers, monthly regional face-to-face meetings in a host club, weekly

face-to-face meetings with local staff, one-on-one meetings with her General Manager, and

weekly calls with other regional managers.  In the course of visiting other clubs for meetings,

Richards stated she observed other Life Spa Department Heads engaging in the same duties.

In addition to these job-specific duties, the witness testified that customer service was a directive from the corporate office via "impact" training to help create a recognizable brand like Nike or McDonald's.  LTF managers, Richards recalled, were required to engage all customers so that the interaction was the same in each club.

The witness stated that LTF directed in the SOP that Life Spa Department Heads were expected to work 45 hours per week.  Richards stated that if a Life Spa Department Head wanted to receive a bonus or make a profit, he or she would need to work more than 45 hours per week. Based upon her own schedule she created on Microsoft Outlook, Richards scheduled herself approximately 55 hours per week, but usually worked beyond that due to the high level of interaction with members.

She testified that she worked 55 hours per week with no lunch breaks from October 16, 2005 through November 30, 2005.  Her scheduled hours were Monday through Friday from 8:00 a.m. to 6:00 p.m., though she usually worked until 7:00 p.m.  She also stated that she worked from 10:00 a.m. to 5:00 p.m. on Saturdays and that she worked one Sunday per month.  Richards did not believe she could have finished her job in 40 hours per week because the SOP required time was at least 45 hours, and she testified that a Life Spa Department Head could be terminated for not following the SOP.

On cross-examination, Richards clarified that the Commerce club opened January 1, 2005 and that during the October 16, 2005 to November 30, 2005 time frame, she corrected that she was the Life Spa Department Head at the Commerce club and had already left the Novi club.

Richards testified that the Commerce club was about 120,000 square feet.  She believed the membership level was about 24,000.  Richards did not have an assistant Department Head

but did supervise 55 employees in the Spa Department.  The witness stated she usually opened Monday through Thursday and did not schedule herself to close, though she was responsible to do so if another employee could not.

The witness stated that the spa department had "peaks and valleys" of business and the traffic was usually higher during the holiday seasons.  Richards clarified on redirect that even though traffic in the spa came in peaks and valleys, her hours did not change.

Continuing on cross examination, Richards stated that she observed other Life Spa Department Heads at Life Time University, helped train other spa managers, and covered other salons in Michigan when their managers were absent.  The witness stated she did not personally know the other Life Spa Department Heads that she would be representing at trial and had no first-hand knowledge of their hours worked outside what the SOP directed.

Evidence was admitted and Plaintiffs rested their case.

### 9.  Kevin Logan

The first witness called by Defendant was Kevin Logan, LTF's Regional Vice President for the Midwest Region.  Logan's job duties in this capacity include supervision of all club operations for the 13 facilities in his region.  Logan testified that he visits each club at least once per month and knows each Department Head at each club under his supervision.  During the time period of 2004 through 2005, Logan held the position of Area Director, which involved similar supervisory duties.  However, as Area Director Logan had more direct contact with the individual Department Heads.  Logan testified that the clubs under his supervision varied in terms of the sizes of the individual departments, the managerial approaches of the clubs' General Managers, and the tactics of the clubs' Department Heads.  Logan claimed all of these factors,

but especially the personalities and styles of the General Managers, resulted in differences among the clubs.  The company looked for initiative and a willingness to take ownership in its Department Head candidates, Logan said, but each General Manager permitted greater or lesser discretion to their Department Heads.

Logan was familiar with the SOP as it related to training new Department Heads.  He testified that these documents were guidelines that listed best practices and that the suggested number of weekly work hours listed were indicative of a flexible range.  Each Department Head, he said, made his or her own hours, subject to the approval of the club's General Manager.

Logan testified that, outside of his region, clubs would differ in terms of overall size, square footage devoted to each department, maturity of the club, membership levels, number of swipes, and demographics of members.  He claimed that these factors would affect member usage of the different departments and, as a result, the work required from the Department Heads.  Logan also testified that Department Heads vary in terms of job skill, efficiency, and experience, which also affects the amount of time it takes to complete job duties.

On cross-examination, Logan testified that he had never held the position of Department Head at LTF.  He also testified that he could not recall how many Department Heads' meetings he attended during the 2004 to 2005 time period.

On redirect, Logan testified that during that time period, his office was at the Algonquin club and that he and Judy Galloway both worked there during the time period between October 16 and November 20, 2005.  He participated with her in both the Halloween event and "Reindeer Run" that she discussed in her testimony.

### 10. Douglas Ringeisen

Defendant called Douglas Ringeisen as its second and final witness.  On direct and redirect examination, Ringeisen testified to the following.  He has worked for LTF for six years and has been the Manager of Operations Planning and Analysis since 2007.  During the last six years Ringeisen has worked at one of LTF's corporate offices in Minnesota.  Ringeisen testified to the fact that variations from club to club affect how much work there is to do in a specific department.  For example, the number of swipes per day at the club correlate to the activity in the café, and the number of total members and the square footage of the club correlate to the activity within member activities and the spa.  He further testified that the clubs at which Plaintiffs are employed vary in their square footage; the club in Champlain, Illinois is approximately 62,000 square feet and the club in Warrenville, Illinois is approximately 115,000 square feet.

Ringeisen said he believed that the date a club opened correlates to how much business that club does.  He testified that, in general, the longer a club is open the more members it has.  He noted that the clubs Plaintiffs worked at vary in their maturity range; the Columbus, Ohio facility opened in 1999 and the Commerce, Illinois club opened in 2005.

Last, Ringeisen testified that there are discrepancies in the way each department in each club does business.  The Life Café Department Heads have some discretion in the mixture of products they carry.  Each spa varies in the way it divides its revenue between its services such as hair styling, massage therapy, and retail sales.  The Members Activities Department at each club varies dependent upon the number of children and families that belong to the club.

Ringeisen testified that the variation in activity between departments is significant enough that each club's budget is tailored specifically to it.

Additional evidence was admitted and Defendant rested.

## B. Deposition Summaries

The parties admitted by agreement five depositions in their entirety for the Court's consideration. These depositions are summarized below.

### 1. Brandon Joseph Adams (Doc. # 112)

Adams has been the Director of the Life Spa Division for LTF since December, 1999. *Id*. at 4. In this role, Adams is a consultant to both the Spa Managers and the General Managers. *Id*. at 5. He is also the immediate supervisor of the Spa Managers. *Id*.

Adams testified that a Life Spa Department Head would typically supervise 18 employees at a large facility and nine employees at a smaller facility. *Id*. at 15. He said the Department Heads are expected to meet one-on-one with their employees once every month. *Id*. Adams said it is recommended for the spa to be open from 9 a.m. to 9 p.m. Monday through Friday and 9 a.m. to 7 p.m. on Saturday and Sunday. *Id*. 17. He also said it is recommended for the Life Spa Department Heads to open the spa twice a week, close the spa twice a week, and work two weekend days a month. *Id*. Other than this, Adams stated that there is no hour requirement for the Life Spa Department Heads; they are just expected to work as much as necessary to get the job done. *Id*. at 60. He testified that some Life Spa Department Heads have administrative assistants, but because the Life Spa Department Head is ultimately responsible for the success of the spa, only limited duties are delegated to these assistants. *Id*. at 18-19.

With regards to compensation, Adams stated that he helps the General Manager develop the target pay for new Department Heads. *Id*. at 20-21. Adams said he believed the compensation for all department heads is 80 % salary and 20 % bonus, but that he had no role in developing this plan. *Id*. at 22. Adams testified that employees of the spa are required to clock in and out to verify attendance, but he was not sure if the salaried Department Heads could do this. *Id*. at 42-43.

Adams stated that the Life Spa Department Heads have a certain amount of control over the total revenue the spa brings in. The Department Heads can increase the total revenue, and thus their bonus, by building relationships with past clients, hiring new employees, and coordinating promotions. *Id*. at 55.

### 2. Julie Shipe (Doc. # 113)

Julie Shipe is currently employed by LTF as the Senior Director of Member Activities and Retention. *Id*. at 5. She has worked for LTF for 11 ½ years. *Id*. Shipe oversees the entire Member Activities Division. *Id*. at 7.

Shipe does not believe that managers at LTF should be eligible for overtime. *Id*. at 18. She testified that the managers were paid to do their job whether its 20 hours a week or 60 hours a week. *Id*. However, Shipe did not know what is required under federal and state wage laws for an employee to be considered exempt from overtime. *Id*. at 19.

Shipe stated that Member Activities Department Heads receive a base pay and a bonus pay which depends on the revenue their department generates. *Id*. at 22-23. She said the majority of revenue each department brings in comes from selling programs to the club's

members.  *Id*. at 23.  Shipe guessed that selling these programs would make up more than 50% of a Department Head's job.  *Id*. at 24.

Shipe testified that the Member Activities Department Heads are generally expected to work about 45 hours per week.  *Id*. at 58.  However, she said that the Department Heads would most likely work up to 60 hours a week during their first month and one-half or during the start of a new program session.  *Id*. at 58-59.

### 3.  Ken Zylstra (Doc. # 114)

Ken Zylstra has been the National Director of the Life Café since April of 2002.  *Id*. at 5. Zylstra testified that since 2002 he has been compensated with a base pay and a bonus, and that the bonus depends on earnings before interest, tax, depreciation, and amortization.  *Id*. at 11.  He also said that he had two deductions from his pay due to overpayments in 2005, but that he did not recall how much was deducted.  *Id*. at 11-12.  Zylstra testified that he did not have any knowledge of the FLSA, but because he has been a salaried employee for most of his career he did not expect to be paid overtime.  *Id*. at 13-15.

Zylstra stated that the Life Café Department Heads are responsible for running the café within their club and for operating the bistro during the summer.  *Id*. at 17-18.  He said that a Life Café Department Head's weekly hours vary depending on the season, but they are typically within 45 to 55 hours per week.  *Id*. at 24.  While he acknowledged that every facility has a time clock for the hourly employees to punch in and out, he did not believe the Department Heads had the capability to do this because they are salaried team members.  *Id*. at 46.  He further testified that LTF did not have any records of the hours worked by the Life Café Department Heads.  *Id*. at 46-47.

Zylstra testified that 60 to 80 % of a Life Café Department Head's time is spent working "in the trenches" meaning working as a team member preparing food, cleaning tables, and interacting with guests.  *Id*. at 25.  Zylstra said that 20 to 40 % of the Department Head's time is spent on administrative tasks that typically involve taking calls from other team members.  *Id*. at 35.

### 4. Derek Boaz (Doc. # 115)

Derek Boaz is LTF's Compensation and Human Resources Information Systems Manager ("HRIS").  *Id*. at 5.  He has been with the company since October of 2004.  *Id*.  HRIS is a system that LTF uses to maintain employee information such as home addresses, social security numbers, job titles, and salaries.  *Id*.  Boaz's responsibilities include job descriptions, pay grades, salary ranges, and bonus plans.  *Id*. at 6.  He testified that when a new position is created, he works with the Chief Operating Officer, the Chief Financial Officer, and the human resources executive to design a compensation plan.  *Id*. at 5-6.

Boaz testified that in previous jobs, his duties have included ensuring compliance with the FLSA.  *Id*. at 8.  While he said he has been to classes and seminars dealing with the requirements of the FLSA, the only training he had during his tenure with LTF was a conference in the summer of 2005.  *Id*. at 9-11, 39.  Boaz understood the FLSA to require an employee to make more than $455 a week and perform higher level management duties in order to earn a salary and thus be exempt from overtime.

Boaz stated that he understood the instant action to be about the reclaiming of bonus overpayments to employees.  *Id*. at 14.  He testified that LTF took some deductions from salaried employees' base pay.  *Id*. at 14-15.  However, he did not think this was illegal because it offset

overpaid bonuses that these employees had received; thus by the end of the year they had been paid their full salary.  *Id*. at 15.  Boaz did not attempt to confirm the legality of these base pay deductions with the Department of Labor.  *Id*. at 43.

### 5. Daniel J. Whitacre (Doc. # 117)

Daniel J. Whitacre has been an Area Director at LTF since 2000.  *Id*. at 5.  As an Area Director, Whitacre is responsible for the reports and revenues for the six clubs in his jurisdiction, interviewing personal trainers, and training General Managers.  *Id*. at 6-7.  Whitacre testified that he received a notice of this lawsuit but did not participate because he felt he was compensated fairly by LTF.  *Id*. at 22.  Whitacre said he only remembered hearing other employees complain about deductions being taken from their bonus, not from their base pay.  *Id*. at 24.

Whitacre stated that Department Heads are expected to work about 45 hours a week.  *Id*. at 34.  However, events such as open houses or races could require the department head to work more than 45 hours.  *Id*.  Whitacre also said that Department Heads were expected to fill in whenever their department was missing an employee.  *Id*. at 35.  Because the Department Heads are paid a salary, Whitacre said they would be paid the same whether they worked 28 hours or more than 45 hours per week.  *Id*. at 60-61.  He also testified that, while LTF does not require salary employees to clock in and out, it has the technology to implement such a policy.  *Id*. at 61.

## C. Exhibits Admitted

The Court admitted Plaintiffs' Exhibits 1 through 6 on June 23, 2010, without objection. Plaintiffs' Exhibit 1 is Plaintiff Victor Barge's job description.  Plaintiffs' Exhibits 2 and 3 are the SOP for the Member Activities Department and Life Café Department, respectively. Plaintiffs' Exhibit 4 is Plaintiff Judith Galloway's schedule for the Algonquin Café from

November 2004 through February 2006. The SOP for the Life Spa Department is Plaintiffs'

Exhibit 5. Finally, Plaintiffs' Exhibit 6 is the personal calendar of Plaintiff Jennifer McCarthy.

      The Court admitted Defendant's Exhibits 10 and 11 without objection on June 24, 2010.

Defendant's Exhibit 10 is LTF's Form 10-K, which was filed with the United States Securities

and Exchange Commission in 2004 and Exhibit 11 is LTF's Form 10-K filing for 2005.

## VI. Standard for Unpaid Wages

      The following indicates the Court's conclusions of law regarding the appropriate

standard applicable to the determination of the amount of unpaid hours, if any, worked by

Plaintiffs. *See* Fed. R. Civ. P. 52(a).

      During her opening and closing arguments, counsel for Plaintiffs, relying on *Anderson v.*

*Mt. Clemens Pottery Co.*, 328 U.S. 680, 686-87 (1946), *superseded by statute on other grounds*

*as stated in Carter v. Panama Canal Co.*, 463 F.2d 1289, 1293 (D.C. Cir. 1972), asserted that

Plaintiffs were required to produce sufficient evidence to show the amount and extent of the

uncompensated hours of work performed as a matter of just and reasonable inference. During

his opening and closing arguments, however, defense counsel pointed the Court to *O'Brien v. Ed*

*Donnelly Enters.*, 575 F.3d 567 (6th Cir. 2009) and *Myers v. Copper Cellar Corp.*, 192 F.3d 546,

551 (6th Cir. 1999)[1] for the proposition that the *Mt. Clemens Pottery* "just and reasonable

inference" standard does not apply to the establishment of the uncompensated hours for each

individual plaintiff. Instead, Defendant relies upon the proposition set forth in *O'Brien* and in

---

[1]The Court notes that counsel also cited one Oregon district court case and one Second Circuit court case for support of his proposition. Because *Mt. Clemens Pottery*, *O'Brien*, and *Myers* are dispositive of this issue, and binding upon this Court, the Court declines to address the merits, if any, these other cases have to support Defendant's argument.

*Myers* that a FLSA plaintiff must prove by a preponderance of the evidence that he or she performed work for which he or she was not properly compensated.  *See O'Brien*, 575 F.3d at 602 and *Myers*, 192 F.3d at 551 (both citing to *Mt. Clemens Pottery*, 328 U.S. at 686-87).  Thus, Defendant posits that each individual plaintiff, the eight testifying plaintiffs and the 16 nontestifying plaintiffs, must prove by a preponderance of the evidence the hours he or she claims were not properly compensated.  This standard would, therefore, require dismissal with prejudice of the nontestifying plaintiffs because none of the testifying witnesses had first-hand knowledge of the amount of hours the nontestifying witnesses worked.  This Court disagrees.

Neither *O'Brien* nor *Myers* stands for the proposition, as Defendant posits, that each plaintiff must prove by a preponderance of the evidence each plaintiff's hours of uncompensated work.  The preponderance of the evidence standard applies to proving FLSA liability, as is shown in *O'Brien*, or to proving the damages of plaintiffs who were improperly denied overtime pay and the defendant employer kept records of the employees' hours worked, as shown in *Myers*.

Specifically, in declining to apply the more lenient *Mt. Clemens Pottery* "just and reasonable inference" standard, the *Myers* court explained:

> Because the plaintiffs failed to carry their burden of proving damages with specificity by the use of available employment records, the option to prove their damages inferentially, which arises only when the employer has neglected to create or preserve accurate or complete records, was unavailable to them.  *See id.*

*Myers*, 192 F.3d at 551-52.  Unlike Defendant here, the *Myers* defendant kept payroll records. Consequently, the court required the plaintiffs to utilize the records to determine the amount of hours they worked, as opposed to utilizing the *Mt. Clemens Pottery* inferential standard:

However, the defendant possessed precise records from which the plaintiffs could have conclusively reconstructed the definite days and hours during which each plaintiff worked during a designated "salad shift."

*Id.* at 551.

With regard to *O'Brien*, that court too indicated that it is a plaintiff's burden to prove by a preponderance of evidence that he or she performed work for which he or she was not properly compensated. However, the court went on to explain when that standard is not applicable and a more relaxed one applies:

To begin with, a "FLSA plaintiff must prove by a preponderance of evidence that he or she 'performed work for which he [or she] was not properly compensated.' " *Myers v. Copper Cellar Corp.*, 192 F.3d 546, 551 (6th Cir. 1999) (citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686-87 (1946), *superseded by statute on other grounds as stated in Carter v. Panama Canal Co.*, 463 F.2d 1289, 1293 (D.C. Cir. 1972)). To determine the extent of damages, the plaintiff can "prove his or her 'under-compensation' damages through discovery and analysis of the employer's code-mandated records. However, if the employer kept inaccurate or inadequate records, the plaintiff's *burden of proof is relaxed*, and, upon satisfaction of that relaxed burden, the onus shifts to the employer to negate the employee's inferential damage estimate." *Id.* (emphasis added) (citing *Mt. Clemens Pottery*, 328 U.S. at 687-88).

*O'Brien*, 575 F.3d at 602. The relaxed standard by which an employee may "prov[e] that he performed work for which he was not properly compensated" was first articulated by the *Mt. Clemens Pottery* Court. In that case the United States Supreme Court explained:

When the employer has kept proper and accurate records, the employee may easily discharge his burden by securing the production of those records. But where the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes, a more difficult problem arises. The solution, however, is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work. Such a result would place a premium on an employer's failure to keep proper records in conformity with his statutory duty; it would allow the employer to keep the benefits of an employee's labors without paying due compensation as contemplated by the Fair Labor Standards Act. In such a situation we hold that an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly

42

compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.

*Mt. Clemens Pottery*, 328 U.S. at 686-87.

The issue before the *O'Brien* court was whether the relaxed *Mt. Clemens Pottery* standard, *i.e.*, showing the amount and extent of the uncompensated work as a matter of just and reasonable inference, applies to reduce a plaintiff's burden of showing whether there was a FLSA violation.  The *O'Brien* plaintiffs, two individuals on behalf of themselves only, argued that their "claims should not have been dismissed on summary judgment because they only needed to satisfy this lesser initial burden, as the defendants' records were inaccurate and inadequate."  *O'Brien*, 575 F.3d at 602.  In rejecting this argument, the Sixth Circuit explained:

> However, *Mt. Clemens Pottery* and its progeny do not lessen the standard of proof for showing that a FLSA violation occurred. . . .
>
> In short, *Mt. Clemens Pottery* does not help plaintiffs show that there was a violation under the FLSA.  It would only allow them to prove damages by way of estimate, if they had already established liability.  Plaintiffs' failure to show a genuine issue of material fact as to the time-sheet-alterations claims required the district court's entry of summary judgment against them . . . .

*Id.* at 602-03.

In the instant action, the Court did not apply the *Mt. Clemens Pottery* standard to determine liability.  (*See* Docs. # 75, 88.)  The Court's decision on summary judgment was appealed by all parties and ruled upon by the Sixth Circuit resulting in its conclusion that LTF is liable for overtime compensation to Plaintiffs for "violations of 29 C.F.R. § 541.602 [that] occurred in November and December of 2005" and that LTF "is liable for overtime compensation to those Plaintiffs employed and subject to the corporate bonus-pay plan from January 1, 2004 to August 23, 2004" because LTF's "pre-August 23, 2004 compensation plan

[created] a substantial likelihood of deductions." *Baden-Winterwood v. Life Time Fitness*, 566
F.3d 618, 634 (6th Cir. 2009).  The case has now moved into the damages phase, wherein the
Court must determine the amount of overtime pay, if any, Plaintiffs are due.  With regard to
proving those uncompensated hours, the *O'Brien* court explained:

> *Mt. Clemens Pottery* gives a FLSA plaintiff an easier way to show what his or her
> damages are.  When an employer keeps inaccurate or inadequate records, for a FLSA
> plaintiff to show what his or her damages were, a FLSA plaintiff does not need to
> prove every minute of uncompensated work.  Rather, she can estimate her damages,
> shifting the burden to the employer.  If the employer cannot negate the estimate, then
> the "court may award damages to the employee, even though the result be only
> approximate." *Mt. Clemens Pottery*, 328 U.S. at 688.

*Id.*

Accordingly, the Court concludes that Plaintiffs were required to "produce[] sufficient
evidence to show the amount and extent of [their] work as a matter of just and reasonable
inference." *Mt. Clemens Pottery*, 328 U.S. at 687.  "The burden then shifts to the employer to
come forward with evidence of the precise amount of work performed or with evidence to
negative the reasonableness of the inference to be drawn from [Plaintiffs'] evidence." *Id.*

## XII.  Findings of Fact and Conclusion of Law

After consideration of the credibility of each witness that testified before it at the bench
trial, the admitted exhibits, the admitted depositions, and the parties' stipulations, the Court
makes the following findings of fact and conclusions of law.  The Court concludes that the
testifying plaintiffs have carried their burden of proof but that Defendant has not carried its
burden as explained in detail below.  Thus, the Court must determine the amount of
uncompensated hours each testifying plaintiff worked.  That determination is by necessity
imprecise, involving estimates and averages, since Defendant failed to keep records of the

precise time Plaintiffs worked.  *See Cole Enters.*, 62 F.3d at 780-81 (relying on *Mt. Clemens*

*Pottery* to explain that the defendant employer's objection to "the estimates of back wages due . .

. apparently because they may not be precisely accurate" was not well taken).  The *Mt. Clemens*

*Pottery* Court explained:

> The employer cannot be heard to complain that the damages lack the exactness and
> precision of measurement that would be possible had he kept records in accordance
> with the requirements of section 11(c) of the [FLSA]. And even where the lack of
> accurate records grows out of a bona fide mistake as to whether certain activities or
> non-activities constitute work, the employer, having received the benefits of such
> work, cannot object to the payment for the work on the most accurate basis possible
> under the circumstances.

328 U.S. at 688.  That is, Plaintiffs need not prove their damages with precision.  *See id.*

Additionally, during trial Defendant's witnesses testified that, although the SOP dictated

that the Department Heads were expected to work 45 to 46 hours per week, the expectation was

that the Department Heads would not work more than those hours.  Defense counsel also elicited

cross-examination testimony from Plaintiffs regarding whether Defendant required Plaintiffs to

work the amount of hours Plaintiffs claim they worked or whether Plaintiffs voluntarily worked

the  overtime hours.  However, whether Plaintiffs voluntarily worked more hours than they were

expected to work is not relevant to the issue of whether Defendant is required to compensate

Plaintiffs for that work.  "[I]t is the responsibility of management to see that work is not

performed if it does not want it to be performed."  *Cole Enters.*, 62 F.3d at 779.  Employers "

'cannot sit back and accept the benefits without compensating for them.' "  *Id.* at 779-80

(quoting 29 C.F.R. § 785.13).

## A.  Members Activities Department Heads

The Court concludes that Teresa Chaney's testimony was sufficient to show as a matter of just and reasonable inference that she worked an average of 55 hours per week during the relevant time period.  The parties stipulated that the relevant time period for Chaney is May 31, 2004 through August 23, 2004, a total of 12 workweeks.  The parties also stipulated that Chaney took 40 hours paid time off during July 16, 2004 through July 31, 2004, a period encompassing 2 workweeks.  However, Chaney testified that the entire 40 hours was taken during one workweek. Consequently, Chaney did not work any time for which she was not paid for 1 week.  Thus, Chaney was not compensated for 15 hours of work per week for 11 weeks

With regard to Amy Baden-Winterwood, the Court concludes that her testimony was sufficient to show as a matter of just and reasonable inference that she worked an average of approximately 53 hours per week during the time period of February 8, 2004 through August 23, 2004, a total of 13 hours per week over 40, for 28 workweeks.  However, during that 28 week period, 6 of the workweeks varied from the 53 hour average.  First, the Court accepts as sufficient Baden-Winterwood's testimony that she lead a group of LTF's clients on a white-water rafting and camping trip and that during that week she worked 89 hours, 49 hours over 40. Second, the parties stipulated that during the pay period of April 1, 2004, Baden-Winterwood took 16 hours of paid time off work, thus working no overtime.  Third, the parties stipulated that during the pay period of April 16, 2004, Baden-Winterwood took 8 hours of paid time off work, therefore working 5 hours over 40.  Fourth, the parties stipulated that during the pay period of May 1, 2004, Baden-Winterwood took 16 hours of paid time off work, thus working no overtime.  Fifth, the parties stipulated that during the pay period of May 16, 2004, Baden-

46

Winterwood took 40 hours of paid time off work, again therefore, working no overtime.  Sixth, the parties stipulated that during the pay period of August 1, 2004, Baden-Winterwood took 32 hours of paid time off work, and thus again, working no overtime.  Therefore, Baden-Winterwood has met her burden of showing that she is due to be compensated the following during the February 8, 2004 through August 23, 2004 time period: an additional 13 hours per week for 22 weeks; an additional 49 hours for 1 week; and an additional 5 hours for 1 week.

Further with regard to Baden-Winterwood, the Court concludes that she worked an average of 50 hours per week during the October 16, 2005 through November 30, 2005, a total of 6 workweeks.  The parties stipulated that during the pay period of November 16, 2005, Baden-Winterwood took 8 hours of paid time off work, thus working 2 hours over 40.  Therefore, Baden-Winterwood has met her burden of showing that she is due to be compensated for 10 hours per week for 5 weeks and 2 hours for 1 week for this time period.

The burden now shifts to Defendant.  However, Defendant did not meet that burden because it failed to come forward with evidence of the precise amount of work performed by Chaney or Baden-Winterwood.  Nor did the testimony presented by Defendant's witnesses, Logan and Ringeisen, the exhibits admitted to this Court, or the deposition testimony of  LTF's managers, negative the reasonableness of the inference the Court drew from these two plaintiffs' testimony and the evidence before it.  Indeed, the deposition testimony of LTF's Senior Director of Member Activities and Retention, Julie Shipe, supports Plaintiffs' position that they were expected to complete their work even if it took up to 60 hours per week.

**B.  Life Spa Department Heads**

The Court finds that Jennifer McCarthy's testimony and Plaintiffs' submitted exhibits were sufficient to show as a matter of just and reasonable inference that she worked 63, 63, 63, 56, 58, 22, and 36 hours per week during the October 16, 2005 through November 30, 2005, the relevant time period for McCarthy.  McCarthy worked fewer hours two of the relevant weeks because of the Thanksgiving holiday.  Thus, McCarthy has met her burden of showing that she is due to be compensated for an additional 23 hours per week for 3 weeks, an additional 16 hours for 1 week, and an additional 18 hours for 1 week.

The Court further finds that Marcia Richards' testimony was sufficient to show as a matter of just and reasonable inference that from October 16, 2005 through November 30, 2005 she worked 55 hours per week.  That time period encompassed 6 workweeks.  Therefore, Richards has met her burden of showing that she is due an additional 15 hours compensation per week for 6 weeks.

The burden is now shifted to Defendant; however, Defendant failed to meet it because it did not come forward with evidence of the precise amount of work performed by McCarthy or Richards.  Nor did the testimony presented by Defendant's witnesses, Logan and Ringeisen, the exhibits admitted to this Court, or the deposition testimony of  LTF's managers, negative the reasonableness of the inference the Court drew from these two plaintiffs' testimony and the evidence before it.  Indeed, the deposition testimony of Brandon Joseph Adams, LTF's Director of the Life Spa Division, supports these Plaintiffs' testimony that they were expected to work as many hours as were necessary to complete their work.

**C.  Life Café Department Heads**

The Court concludes that Scott Konieczny's testimony was sufficient to show as a matter of just and reasonable inference that he worked between 50 and 60 hours per week, an average of 55 hours per week, during 14 weeks of the relevant 15 week time period of May 16, 2004 through August 23, 2004.  The parties stipulated that Konieczny took 2 days off work during one week in July 2004; therefore, he only worked approximately 33 hours that week.  Accordingly, Konieczny has met his burden of showing that he is due to be compensated for an additional 15 hours per week for 14 weeks.

The Court further concludes that Judith Galloway's testimony was sufficient to show as a matter of just and reasonable inference that she worked approximately 58 hours per week for the relevant time periods of May 16, 2004 through August 23, 2004 and October 16, 2005 through November 30, 2005, a total of 20 workweeks.  Although Galloway testified before this Court that she worked between 60 and 80 hours per week, the Court finds that testimony incredible considering Galloway's other responsibilities during those time periods– 6 children and a part-time teaching position–and her prior deposition testimony in a separate case against LTF that indicated that during those same time periods she worked between 55 and 60 hours per week. Galloway's explanation of the prior inconsistent deposition testimony, *i.e.*, she scheduled herself 55 to 60 hours per week in a normal week, but that no week was ever normal and she always worked 60 to 80 hours per week, is belied by her testimony in that same deposition that unequivocally indicated that she *worked* between 55 and 60 hours per week during those time periods.  That deposition was taken at a time closer to the events in question when her memory of the events should have been clearer.  Thus, the Court concludes that Galloway has met her

burden of showing that she is due to be compensated for an additional 18 hours per week for 20 weeks.

The burden is now shifted to Defendant. Defendant, however, did not meet its burden because it did not come forward with evidence of the precise amount of work performed by Konieczny and Galloway. Nor did the testimony presented by Defendant's witnesses, Logan and Ringeisen, the exhibits admitted to this Court, or the deposition testimony of LTF's managers, negative the reasonableness of the inference the Court drew from these two plaintiffs' testimony and the evidence before it.

**D. Part-Time Employee**

The Court finds that Tina Seals's testimony was sufficient to show as a matter of just and reasonable inference that she worked an average of 55 hours per week from August 1, 2005 through September 10, 2005, a total of 6 workweeks and that she worked an average of 35 hours per week from September 11, 2005 through October 24, 2005, a total of 6 workweeks. Because Seals was considered a part-time employee, she was compensated for 20 hours per week for each of the relevant 12 weeks. Thus, Seals has met her burden of showing that she is due to be compensated for an additional 15 hours per week for 6 weeks and an additional 35 hours per week for 6 weeks.

The burden is now shifted to Defendant; however, Defendant failed to meet it because it did not come forward with evidence of the precise amount of work performed by Seals. Nor did the testimony presented by Defendant's witnesses, Logan and Ringeisen, the exhibits admitted to this Court, or the deposition testimony of LTF's managers, negative the reasonableness of the inference the Court drew from Seals' testimony and the evidence before it.

**E.  Director of Project Management Organization**

The Court concludes that Victor Barge's testimony and job description admitted as Plaintiffs' Exhibit 1 were sufficient to show as a matter of just and reasonable inference that he worked between 45 and 60 hours per week, an average of 53 hours per week for the relevant time period.  The parties stipulated that the relevant time period for Barge is July 6, 2004 through August 23, 2004, approximately 7 workweeks.  Therefore, Barge has met his burden of showing that he is due to be compensated for an additional 13 hours per week for 7 weeks.

The burden is now shifted to Defendant.  Defendant, however, failed to meet it because it did not come forward with evidence of the precise amount of work performed by Barge.  Nor did the testimony presented by Defendant's witnesses, Logan and Ringeisen, the exhibits admitted to this Court, or the deposition testimony of  LTF's managers, negative the reasonableness of the inference the Court drew from Barge's testimony and the other evidence before it.

**VIII.  Nontestifying Plaintiffs**

**A.  Standard for Representative Testimony**

The following is the Court's conclusions of law regarding the appropriate standard applicable to the determination of whether the testifying plaintiffs were representative of the nontestifying plaintiffs.

 Relying on *Mt. Clemens Pottery*, courts, including the Sixth Circuit, have uniformly held that damages in FLSA overtime cases can be proved with testimony from a representative group of plaintiffs.  *See e.g.*, *Dept. of Labor v. Cole Enter., Inc.*, 62 F.3d 775, 781 (6th Cir. 1995) (citing *Reich v. S. New England  Telecomm. Corp.*, 121 F.3d 58 (2nd Cir. 1997); *Reich v. S.  Md. Hosp., Inc.*, 43 F.3d 949, 951 (4th Cir. 1995); *Martin v. Tony and Susan Alamo Found.*, 952 F.2d

1050, 1052 (8th Cir. 1992); *Martin v. Selker Bros., Inc.*, 949 F.2d 1286, 1297 (3d Cir. 1991);

*Sec'y of Labor v. DeSisto*, 929 F.2d 789, 792 (1st Cir. 1991); *McLaughlin v. Ho Fat Seto*, 850

F.2d 586, 589 (9th Cir. 1988); *Brock v. Norman's Country Mkt., Inc.*, 835 F.2d 823, 828 (11th

Cir. 1988); *Beliz v. W.H. McLeod & Sons Packing Co.*, 765 F.2d 1317, 1331 (5th Cir. 1985)).

The Sixth Circuit explained that "[t]he testimony of fairly representative employees may be the

basis for an award of back wages to nontestifying employees." *Id.*

　　A Southern District of Ohio court has articulated some guidelines for use in considering

whether representative testimony is proper, noting that "there is no magic formula for the

number or percentage of plaintiffs who must testify," and instead, it "is axiomatic that the weight

to be accorded evidence is a function not of quantity but of quality." *Takacs v. Hahn Auto.

Corp.*, No. C-3-95-404, 1999 U.S. Dist. LEXIS 22146, at *6-7 (S.D. Ohio Jan. 25, 1999) (citing

*DeSisto*, 929 F.2d at 793) (" 'the adequacy of the representative testimony necessarily will be

determined in light of the nature of the work involved, the working conditions and relationships,

and the detail and credibility of the testimony' ") and *Reich*, 121 F.3d 58 at 68 ("depending on

the nature of the facts to be proved, a very small sample of representational evidence can

suffice")).  The "focus is not on the numbers in isolation but on whether the district court could

reasonably conclude that there was 'sufficient evidence to show the amount and extent of . . .

[uncompensated] work as a matter of just and reasonable inference.' " *Id.* at *7 (quoting *Reich*,

121 F.3d at 67-68, which quoted *Mt. Clemens Pottery*, 3288 U.S. at 687) (alterations in original).

　　The *Takacs* court also discussed what quality means in the situation where, like in the

instant action, Plaintiffs represent a variety of job categories:

> The Plaintiffs argue that all of their members worked in only two job categories,
> store manager and senior assistant store manager. Defendant, on the other hand,

contends that each separate store in which a particular Plaintiff worked is a separate job category.  In *Secretary of Labor v. DeSisto*, 929 F.2d 789 (1st Cir. 1991), the First Circuit discussed representative testimony in instances in which employees work in a number of different job categories:

> Where the employees fall into several job categories, it seems to us that, at a minimum, the testimony of a representative employee from, or a person with first-hand knowledge of, each of the categories is essential to support a back pay award. *See Donovan v. Simmons Petroleum Corp.*, 725 F.2d 83 (10th Cir. 1983); *Donovan v. New Floridian Hotel, Inc.*, 676 F.2d 468 (11th Cir. 1982); *Dole v. Solid Waste Services, Inc.*, 733 F. Supp. 895 (E.D. Pa. 1989), *aff'd*, 897 F.2d 521 (3d Cir.), cert. denied, 497 U.S. 1024, 111 L. Ed. 2d 781, 110 S. Ct. 3271 (1990).  This testimony need not be given orally at trial, but it must be properly before the court as admitted evidence.

929 F.2d at 793. Although the Defendant has cited a number of cases in which courts commented that there was testimony from an employee at each location, it has not cited any case in which a court said that such was an absolute requirement.

*Id.* at *8-9 (citations omitted).

Similarly, in *Reich* the appellate court affirmed the district court's award of damages to the class where 39 employees, accounting for each of the five job categories in question, testified on behalf of 1500 workers. The court focused on the fact that:

> These witnesses served directly in four of the job categories ([outside plant technicians] OPTs, network deployment technicians/cable splicers, network delivery technicians/cable repair workers, and service delivery technicians/installation and maintenance workers), and some of the witnesses (particularly the OPTs) had firsthand knowledge of the fifth ([assistant supervisors of construction] ASCs). Although the district court did not make express findings that the sample covered the three types of sites at which SNET's work is performed, it is clear from the findings and the record that witnesses had worked in all three areas and testified broadly about their experiences.

121 F.3d at 67 (citations omitted).

Likewise, in *Herman v. Hogar Praderas de Amor, Inc.*, the court noted:

> The Secretary does not have to present the testimony of each underpaid employee;

53

> rather, she may put on a representative sample of employees.  When there are different job categories, however, at least one representative employee or one person with first-hand knowledge of the category should testify.  Generally, a worker can represent other workers only if they all do substantially similar work.  There is no minimum ratio that the Secretary must meet; the adequacy of the representation is based on the nature of the work, working conditions, on-the-job relationships, and the witnesses' credibility.

130 F. Supp.2d 257, 265 (D. P.R. 2001).

Applying these guidelines to the facts of this case, the question before this Court is, therefore, whether the two testifying plaintiffs from each job category are fairly representative of those who did not testify so that the Court can reasonably conclude that there was sufficient evidence to show the amount and extent of uncompensated work as a matter of just and reasonable inference.

**B.  Findings of Fact and Conclusions of Law**

**1.  Representative testimony of full-time employees**

After consideration of the two witnesses presented as representatives of each category of jobs, *i.e.*, the Members Activities Department Heads, the Life Spa Department Heads, and the Life Café Department Heads, and consideration of Defendant's witnesses, the admitted exhibits, the admitted depositions, and the parties' stipulations, the Court makes the following findings of fact and conclusions of law relative to the representative testimony issue.

The evidence presented indicates that the job expectations among the positions were generally uniform.  The testifying plaintiffs testified to such, and in the admitted depositions the defense representatives discuss the common goals for the Department Head positions.  There are common objectives set forth in each of the SOP for each area.  Additionally, the Department Heads in each area were subject to the same expectations regarding their schedule working

54

hours.  For example, LTF recommends Life Spa Department Heads open at least two days per week, close two days per week, work one or two weekends, and otherwise work "whatever time is [] necessary to get the job done."  (Doc. # 112; Brandon Joseph Adams' Dep. at 60.)  There are similar SOP for the other Department Heads.

Likewise, the job duties for each of the positions are the same regardless of the location of the club or any other factor.  Indeed, the job duties are set forth in the SOP; as are the minimum suggested hours for each Department Head.  There are not different SOP for each job position based on the LTF club location.

Further, the Department Heads were all required to participate in meetings with other Department Heads from locations besides their own and were generally familiar with the amount of hours those others' worked.  The testimony showed that the testifying plaintiffs all believed, from their interaction with these other Department Heads, that the others were required to work similar hours to their own.

Moreover, Plaintiffs were all on the same compensation plans, which set forth the same formula of requirements for Plaintiffs with respect to meeting revenue and budget goals.

Finally, at trial, Plaintiffs testified fairly uniformly about the causes requiring them to stay late and work overtime.  For example, all Department Heads were responsible for filling in for an absent employee, supervising club events, and making themselves visible and available to club members.

The Court finds that the testimony of the testifying plaintiffs from each job category was fairly representative of those who did not testify so that the Court can reasonably conclude that there was sufficient evidence to show the amount and extent of uncompensated work of the

nontestifying plaintiffs as a matter of just and reasonable inference.  *See Mt. Clemens Pottery*,

328 U.S. at 690-91; *see also Cole Enter., Inc.*, 62 F.3d at 781.  The Court notes that the testifying

plaintiffs had firsthand knowledge of each of the job positions, an essential element in

supporting an award of back pay.  *See Takacs*, 1999 U.S. Dist. LEXIS 22146, at *8-9; *Reich*, 121

F.3d at 67; *Herman*, 130 F. Supp.2d at 265.  Further, the quality of the testimony convinces the

Court that it is to be accorded weight sufficient to show the amount and extent of the

nontestifying plaintiffs' uncompensated work as a matter of just and reasonable inference.

Finally, although this Court's focus is not on the numbers in isolation, the "sample" employees

equal a large percentage of the employees whom they represent, which certainly weighs in favor

of the appropriateness of the representation.  *See Reich*, 121 F.3d at 66 (affirming district court's

award of "back wages to an entire group of employees based on the testimony of a representative

sample" that was equal to 2.5 % of the plaintiff group).  The Members Activities Department

Head testifying plaintiffs equal 20% of the total Members Activities Department Head group; the

Life Spa Department Head testifying plaintiffs equal 29% of the total Life Spa Department Head

group; the Life Café Department Head testifying plaintiffs equal 50% of the total Life Café

Department Head group; and, in totality the testifying plaintiffs equal 29% of plaintiffs they

represent.

### 2. Testimony of part-time employee

During trial, Defendant argued that, should the Court find that the testifying plaintiffs

were fairly representative of the nontestifying plaintiffs, the Court should consider the testimony

of Plaintiff Tina Seals as representative of the Members Activities Department Heads.  Seals

testified that during some months of the year she was able to complete her work in 40 or less hours per week.  Defendant's argument is not well taken.

First, the Court permitted testimony of Seals on her own behalf, concluding that based upon her part-time status it was inappropriate to have her hours determined by representative testimony.  (Doc. # 105 at 5) ("The Court determines that the appropriate procedure is to have Seals appear at trial as opposed to having her damages, if any, determined by representative testimony.").  For the same reasons it was not reasonable to have Seals's damages determined by representative testimony, it is not reasonable to have the nontestifying plaintiffs' damages determined by Seals's testimony.  Specifically, as stated, Seals was a part-time employee.  That status alone renders it reasonable to assume that Seals, being paid salary on the assumption she was working approximately 20 hours per week, would not be inclined to work as many hours as an employee categorized as full-time, being paid salary on the assumption he or she worked at least 40 hours per week.  Seals's testimony affirms this assumption.

At trial Seals testified that during the summer months she worked between 50 and 60 hours per week to complete her work and that during the remainder of the year she worked between 30 and 40 hours per week to complete her work.  Seals clarified that although she completed the work necessary for the Members Activities Department to function, she did not meet all of the goals and expectations set forth by management and in the SOP.

Further, the parties have stipulated to a different formula, in accordance with the FLSA regulations, applicable to Seals based upon her status as a part-time employee.

Finally, were the Court to take account of Seals's hours in estimating proportionately the amount due to the full-time Members Activities Department Heads, it would skew the amount higher than the Court finds reasonable.

Accordingly, the Court finds that it cannot reasonably conclude that part-time Members Activities Department Head Tina Seals's testimony is fairly representative of the full-time Members Activities Department Heads. Seals's hours cannot be used to show the amount and extent of uncompensated work of the nontestifying plaintiffs as a matter of just and reasonable inference.

### 3. Amount of hours to be attributed to each nontestifying plaintiff

As the Court explained *supra*, *Mt. Clemens Pottery* provides that if the offending employer fails to produce evidence of the precise number of hours each testifying plaintiff worked or evidence that negatives the inference a court drew from the testimony of the testifying plaintiffs and the totality of the evidence before it, a court may then award damages to the employee and to those nontestifying plaintiffs for whom the employee represented even though the result be only approximate. *See Mt. Clemens Pottery*, 328 U.S. at 687-88. "It is enough under these circumstances if there is a basis for a reasonable inference as to the extent of the damages." *Id.* at 688. The Court has already determined that the testifying plaintiffs met their burden of producing "sufficient evidence to show the amount and extent of [their] work as a matter of just and reasonable inference" *Mt. Clemens Pottery*, 328 U.S. at 687, and that Defendant failed to meet its burden of coming "forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from [Plaintiffs'] evidence," *Id.*

58

This conclusion is now applied to the nontestifying plaintiffs to determine the amount of overtime pay owed to each of them. *See Cowan v. Treetop Enters.*, 163 F. Supp. 2d 930, 938 (M.D. Tenn 2001) ("From the testimony of the Plaintiffs' and the Defendants' employee records, the Court finds, as did Judge Higgins in his earlier ruling, that Plaintiffs worked an average of 89.04 hours per week and applying *Mt. Clemens*, this finding is applied to the entire Plaintiff class to determine the amount of overtime backpay owed for the number of weeks of work stipulated by the parties."). *See also Fegley v. Higgins*, 19 F.3d 1126, 1132, 1135 (6th Cir. 1994) (reversing district court for refusing to "extrapolate" an approximation of damages to the nontestifying plaintiffs and remanded the action for determination of damages in accordance with *Mt. Clemens Pottery* standards). Like the Court's findings relative to the testifying plaintiffs, Defendant "employer cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had he kept records in accordance with the requirements of section 11(c) of the [FLSA]." *Mt. Clemens Pottery*, 328 U.S. at 688.

### a. Members Activities Department Heads

The Court determined as a matter of just and reasonable inference that Plaintiff Teresa Chaney worked 55 hours per week, that Plaintiff Amy Baden-Winterwood worked 53 hours per week during one time period, 50 hours per week during a separate time period, and 89 hours 1 week. The Court has further found that the testifying plaintiffs from the Members Activities Department Head category were fairly representative of those who did not testify so that the Court can reasonably conclude that there was sufficient evidence to show as a matter of just and reasonable inference that the nontestifying plaintiffs worked the same average that these testifying plaintiffs worked. However, the Court finds it inappropriate to take as representative

the week that Baden-Winterwood worked 89 hours during a white-water rafting and camping trip.  This job duty by all accounts was not a regular activity in which the Members Activities Department Heads engaged.

Thus, the relevant hours per week the Court considers are 55, 53, and 50, which averages 52.7 hours per week.  Therefore, each of the nontestifying Members Activities Department Heads–Kristina Brevard, Elizabeth Davenport, Lisa Gregorich, Jamie House, Robert Nutinsky, Andrea Schroeder, Bridget Ipema, and Elizabeth Ann Bird–shall be awarded 12.7 hours of overtime per week during the relevant time periods based upon this conclusion.

### b.  Life Spa Department Heads

The Court determined as a matter of just and reasonable inference that Plaintiff Jennifer McCarthy worked 63 hours per week and that Plaintiff Marcia Richards worked 55 hours per week, an average of 59 hours per week.  The Court has further found that the testifying plaintiffs from the Life Spa Department Head category were fairly representative of those who did not testify so that the Court can reasonably conclude that there was sufficient evidence to show as a matter of just and reasonable inference that the nontestifying plaintiffs worked an average of 59 hours per week during the relevant time period.  Consequently, each of the nontestifying Life Spa Department Heads–Sarah Erdman, Meghan Fuss, Elizabeth Weiler, and Theresa West–shall be awarded 19 hours of overtime per week during the relevant time periods based upon this conclusion.

### c.  Life Café Department Heads

The Court determined as a matter of just and reasonable inference that Plaintiff Scott Konieczny worked 55 hours per week and that Plaintiff Judith Galloway worked 58 hours per

week, an average of 56.5 hours per week.  The Court has further found that the testifying

plaintiffs from the Life Café Department Head category were fairly representative of those who

did not testify so that the Court can reasonably conclude that there was sufficient evidence to

show as a matter of just and reasonable inference that the nontestifying plaintiffs worked an

average of 56.5 hours per week during the relevant time period.  Therefore, each of the

nontestifying Life Café Department Heads–Christopher Mann, and Angela Mendez shall be

awarded 16.5 hours of overtime per week during the relevant time periods based upon this

conclusion.

        In one of the stipulations submitted as evidence in the trial of this action, Defendant

states:  "Defendant disagrees that Plaintiff Barclay may seek any overtime damages whatsoever

because she failed to respond to Defendant's discovery requests served November 30, 2006 and

otherwise has failed to provide any evidence of the hours she alleges to have worked."  (Doc. #

119 at 5.)  Plaintiff does not respond to this objection.  The employee should not be permitted to

participate at this stage of the proceedings when she has failed to comply with the rules of

discovery.  *See Tum v. Barber Foods, Inc.*, No. 00-371-P-C, 145 Lab.Cas. P 34, 445, 2002 WL

47899 (D. Me Jan. 11 2002) (dismissing FLSA class members for failing to provide discovery).

Therefore, the Court finds that it is appropriate to remove Jennifer Barclay a class member.

### IX.  Awards to Each Plaintiff

        The parties stipulated to the formula to be used to determine the amount to be paid to

Plaintiffs for their uncompensated hours and the liquidated damages to be paid on that amount.

Specifically, the parties stipulated that the hours Plaintiffs worked including and between 41 and

46 are calculated at .5 their regular rate of pay, and hours worked over 46 are calculated at 1.5 their regular rate.  To account for the parties' agreement relative to liquidated damages, Plaintiffs' total overtime damages shall equal 1.7 times the amount of any established overtime damages.

## A.  Testifying Plaintiffs Who Were Full-Time Employees

### 1.  Teresa Chaney is due $5,694.15

As the Court determined above, Teresa Chaney was not compensated for 15 hours of work per week for 11 weeks.  The parties stipulated that Chaney's regular rate of pay during the relevant time period was $18.45 per hour.  Chaney is therefore entitled to the following:

The first 6 overtime hours:

$18.45 x .5 = $9.23 x 6 hours = $55.38 x 11 weeks = $609.18

The remaining 9 overtime hours:

$18.45 x 1.5 = $27.68 x 9 hours = $249.12 x 11 weeks = $2740.32

The total amount owed including liquidated damages:

$609.18 + $2491.20 = $3349.50 x 1.7 = **$5694.15**

### 2.  Amy Baden-Winterwood is due $11,943.92

#### a.  February 8, 2004 through August 23, 2004

As the Court decided above, Amy Baden-Winterwood was not compensated for hours worked during the February 8, 2004 through August 23, 2004 time period as follows:  13 hours per week for 22 weeks; 49 hours for 1 week; and 5 hours for 1 week.  The parties stipulated that Baden-Winterwood's regular rate of pay during that time period was $17.55 per hour.  Thus, Baden-Winterwood is entitled to the following:

### I. 13 hours per week for 22 weeks

The first 6 overtime hours:

$17.55 x .5 = $8.78 x 6 hours = $52.68 x 22 weeks = $1158.96

The remaining 7 overtime hours:

$17.55 x 1.5 = $26.33 x 7 hours = $184.31 x 22 weeks = $4054.82

The total amount owed including liquidated damages:

$1158.96  + $4054.82 = $5213.78 x 1.7 = $8863.43

### ii. 49 hours for 1 week

The first 6 overtime hours:

$17.55 x .5 = $8.78 x 6 hours = $52.68 x 1 week = $52.68

The remaining 43 overtime hours:

$17.55 x 1.5 = $26.33 x 43 hours = $1132.19 x 1 week = $1132.19

The total amount owed including liquidated damages:

$52.68 + $1132.19 = $1184.87 x 1.7 = $2014.28

### iii. 5 hours for 1 week

The first 6 overtime hours:

$17.55 x .5 = $8.78 x 5 hours = $43.90

The total amount owed including liquidated damages:

$43.90 x 1.7 = $74.63

### b. October 16, 2005 through November 30, 2005

The Court further determined that Baden-Winterwood was not compensated for hours

worked during the October 16, 2005 through November 30, 2005 time period as follows:  10

63

hours per week for 5 weeks and 2 hours for 1 week. The parties stipulated that Baden-Winterwood's regular rate of pay during that time period was $12.68 per hour. Therefore, Baden-Winterwood is entitled to the following:

### *I. 10 hours for 5 weeks*

The first 6 overtime hours:

$12.68 x .5 = $6.34 x 6 hours = $38.04 x 5 weeks = $190.20

The remaining 4 overtime hours:

$12.68 x 1.5 = $19.02 x 4 hours = $76.08 x 5 weeks = $380.40

The total amount owed including liquidated damages:

$190.20 + $380.40 = $570.60 x 1.7 = $970.02

### *ii. 2 hours for 1 week*

The first 6 overtime hours:

$12.68 x .5 = $6.34 x 2 hours = $12.68 x 1 week = $12.68

The total amount owed including liquidated damages:

$12.68 x 1.7 = $21.56

### c. total amount due to Baden-Winterwood

$8863.43 + $2014.28 + $74.63 + $970.02 + $21.56 = **$11943.92**

### 3. Jennifer McCarthy is due $4,511.14

The Court determined *supra* that Jennifer McCarthy was not compensated for 23 hours per week for 3 weeks, an additional 16 hours for 1 week, and an additional 18 hours for 1 week. The parties stipulated her regular rate of pay at $21.31 per hour during the relevant time period, and therefore, McCarthy is entitled to the following:

### a.  23 hours per week for 3 weeks

<u>The first 6 overtime hours</u>:

$21.31 x .5 = $10.66 x 6 hours = $63.96 x 3 weeks = $191.88

<u>The remaining 17 overtime hours</u>:

$21.31 x 1.5 = $31.97 x 17 hours = $543.49 x 3 weeks = $1630.47

<u>The total amount owed including liquidated damages</u>:

$191.88 + $1630.47 = $1822.35 x 1.7 = $3098.00

### b.   16 hours for 1 week

<u>The first 6 overtime hours</u>:

$21.31 x .5 = $10.66 x 6 hours = $63.96 x 1 weeks = $63.96

<u>The remaining 10 overtime hours</u>:

$21.31 x 1.5 = $31.97 x 10 hours = $319.70 x 1 week = $319.70

<u>The total amount owed including liquidated damages</u>:

$63.96 + $319.70 = $383.66 x 1.7 = $652.22

### c.  18 hours for 1 week

<u>The first 6 overtime hours</u>:

$21.31 x .5 = $10.66 x 6 hours = $63.96 x 1 week = $63.96

<u>The remaining 12 overtime hours</u>:

$21.31 x 1.5 = $31.97 x 12 hours = $383.64 x 1 week = $383.64

<u>The total amount owed including liquidated damages</u>:

$63.96 + $383.64 = $447.60 x 1.7 = $760.92

### d.  total amount due to McCarthy

$3098.00 + $652.22 + $760.92 = **$4511.14**

### 4.  Marcia Richards is due $4,672.01

Above, the Court decided that Marcia Richards was not compensated for 15 hours per week for 6 weeks.  The parties stipulated that her regular rate of pay was $27.76 per hour during the relevant time period.  Thus, Richards is entitled to the following:

The first 6 overtime hours:

$27.76 x .5 = $13.88 x 6 hours = $83.28 x 6 weeks = $499.68

The remaining 9 overtime hours:

$27.76 x 1.5 = $41.64 x 9 hours = $374.76 x 6 weeks = $2248.56

The total amount owed including liquidated damages:

$499.68 + $2,248.56 = $2748.24 x 1.7 = **$4672.01**

### 5.  Scott Konieczny is due $9,069.23

The Court determined *supra* that Scott Konieczny was not compensated for 15 hours per week for 14 weeks.  The parties stipulated that Konieczny's regular rate of pay was $23.09 during the relevant time period.  Therefore, Konieczny is entitled to the following:

The first 6 overtime hours:

$23.09 x .5 = $11.55 x 6 hours = $69.30 x 14 weeks = $970.20

The remaining 9 overtime hours:

$23.09 x 1.5 = $34.64 x 9 hours = $311.76 x 14 weeks = $4364.64

The total amount owed including liquidated damages:

$970.20 + $4364.64 = $5334.84 x 1.7 = **$9069.23**

**6.  Judith Galloway is due $14,460.13**

      **a.  May 16, 2004 through August 23, 2004**

The Court determined above that Judith Galloway was not compensated for 18 hours per week for time periods of May 16, 2004 through August 23, 2004, a total of 14 workweeks.  The parties stipulated her regular rate of pay as $19.57 during this time period.  Thus, Galloway is entitled to the following:

The first 6 overtime hours:

    $19.57 x .5 = $9.79 x 6 hours = $58.74 x 14 weeks = $822.36

The remaining 12 overtime hours:

    $19.57 x 1.5 = $29.36 x 12 hours = $352.32 x 14 weeks = $4932.48

The total amount owed including liquidated damages:

    $822.36 + $4932.48 = $5754.84 x 1.7 = $9783.23

      **b.  October 16, 2005 through November 30, 2005**

The Court further determined that Galloway was not compensated for 18 hours per week for the relevant time period of October 16, 2005 through November 30, 2005, a total of 6 workweeks.  The parties stipulated her regular rate of pay as $21.83 during this time period.  Therefore, Galloway is entitled to the following:

The first 6 overtime hours:

    $21.83 x .5 = $10.92 x 6 hours = $65.52 x 6 weeks = $393.12

The remaining 12 overtime hours:

    $21.83 x 1.5 = $32.75 x 12 hours = $393.00 x 6 weeks = $2358.00

The total amount owed including liquidated damages:

$393.12 + $2358.00 = $2751.12 x 1.7 = $4676.90

### c.  total amount due to Galloway

$9783.23 + $4676.90 = **$14460.13**

### 7.  Victor Barge is due $8,003.58

Above, the Court determined that Victor Barge was not compensated for 13 hours per week for 7 weeks.  The parties stipulated that Barge's regular rate of pay was $49.82 during the relevant time period.  Accordingly, Barge is entitled to the following:

The first 6 overtime hours:

$49.82 x .5 = $24.91 x 6 hours = $149.46 x 7 weeks = $1046.22

The remaining 7 overtime hours:

$49.82 x 1.5 = $74.73 x 7 hours = $523.11 x 7 weeks = $3661.77

The total amount owed including liquidated damages:

$1046.22 + $3661.77 = $4707.99 x 1.7 = **$8003.58**

## B.  Testifying Part-Time Employee Tina Seals is due $5,880.51

The parties stipulated to the formula to be used to determine the amount to be paid to the only testifying part-time employee for her uncompensated hours and the liquidated damages to be paid on that amount.  Specifically, the parties stipulated that the hours Tina Seals worked including and between 20 and 40 is calculated at her regular rate of pay, which was $13.38 per hour.  The hours Seals worked over 40 is calculated at 1.5 her regular rate.  To account for the parties' agreement relative to liquidated damages, Seals' total amount of pay owed for her hours worked over 40 shall equal 1.7 times the amount.

68

**1.  August 1, 2005 through September 10, 2005**

Seals was paid for 20 hours per week during the period of August 1, 2005 through September 10, 2005, a total of 6 workweeks.  The Court determined that Seals worked 55 hours per week during that time period and was therefore not compensated for 35 hours per week–20 hours per week of regularly compensated work and 15 hours of overtime work.  Thus, Seals is entitled to the following:

The amount owed for hours between 20 and 40:

   $13.38 x 20 = $267.60 x 6 weeks = $1605.60

The amount owed for hours over 40:

   $13.38 x 1.5 = $20.07 x 15 hours = $301.05 x 6 weeks = $1806.30

The total amount owed including liquidated damages:

   $1806.30 x 1.7 = $3070.71 + $1605.60 = $4676.31

**2.  September 11, 2005 through October 24, 2005**

Seals was paid for 20 hours per week during the period of September 11, 2005 through October 24, 2005, a total of 6 workweeks.  The Court determined that Seals worked 35 hours per week during this time period and was thus not compensated for 15 hours per week of regularly compensated work.  Therefore, Seals is entitled to the following:

The amount owed for hours 40 and under:

   $13.38 x 15 = $200.70 x 6 = $1204.20

**3.  total amount due to Seals**

$4676.31 + $1204.20 = **$5880.51**

**C. Nontestifying Members Activities Department Heads**

    **1. Kristina Brevard is due $4,944.69**

The parties stipulated that Kristina Brevard may seek overtime damages for work performed from May 16, 2004 through August 23, 2004, a total of 14 workweeks. The parties further stipulated that Brevard's regular rate of pay was $15.92 per hour. The Court determined that Brevard, as a Members Activities Department Head, is entitled to compensation for 52.7 hours per week during the relevant time period, for which she was only compensated for 40 hours per week. Thus, Brevard was not compensated for 12.7 hours per week for 14 weeks and is entitled to the following:

The first 6 overtime hours:

    $15.92 x .5 = $7.96 x 6 hours = $47.76 x 14 weeks = $668.64

The remaining 6.7 overtime hours:

    $15.92 x 1.5 = $23.88 x 6.7 hours = $160.00 x 14 weeks = $2240.00

The total amount owed including liquidated damages:

    $668.64 + $2240.00 = $2908.64 x 1.7 = **$4944.69**

    **2. Elizabeth Ann Bird is due $1,578.65**

The parties stipulated that Elizabeth Ann Bird may seek overtime damages for work performed from October 16, 2005 through November 30, 2005, a total of 6 workweeks. The parties further stipulated that Bird's regular rate of pay was $11.86 per hour. The Court determined that Bird, as a Members Activities Department Head, is entitled to compensation for 52.7 hours per week during the relevant time period, for which she was only compensated for 40

70

hours per week.  Therefore, Bird was not compensated for 12.7 hours per week for 6 weeks and is entitled to the following:

The first 6 overtime hours:

$11.86 x .5 = $5.93 x 6 hours = $35.58 x 6 weeks = $213.48

The remaining 6.7 overtime hours:

$11.86 x 1.5 = $17.79 x 6.7 hours = $119.19 x 6 weeks = $715.14

The total amount owed including liquidated damages:

$213.48 + $715.14 = $928.62 x 1.7 = **$1578.65**

### 3. Elizabeth Davenport is due $904.79

The parties stipulated that Elizabeth Davenport may seek overtime damages for work performed from January 26, 2004 through February 14, 2004, a total of 3 workweeks.  The parties further stipulated that Davenport's regular rate of pay is $13.59 per hour.  The Court determined that Davenport, as a Members Activities Department Head, is entitled to compensation for 52.7 hours per week during the relevant time period, for which she was only compensated for 40 hours per week.  Thus, Davenport was not compensated for 12.7 hours per week for 3 weeks and is entitled to the following:

The first 6 overtime hours:

$13.59 x .5 = $6.80 x 6 hours = $40.80 x 3 weeks = $122.40

The remaining 6.7 overtime hours:

$13.59 x 1.5 = $20.39 x 6.7 hours = $136.61 x 3 weeks = $409.83

The total amount owed including liquidated damages:

$122.40 + $409.83 = $532.23 x 1.7 = **$904.79**

71

### 4.  Lisa Gregorich is due $10,420.32

The parties stipulated that Lisa Gregorich may seek overtime damages for work performed from May 16, 2004 through August 23, 2004, a total of 14 workweeks.  The parties further stipulated that Gregorich's regular rate of pay was $24.65 per hour during this 14 week period.  Also stipulated by the parties was that Gregorich may seek overtime damages for work performed from October 16, 2005 through November 30, 2005, a total of 6 workweeks, and that Gregorich's regular rate of pay was $20.75 for this 6 week time period.  The Court determined that Gregorich, as a Members Activities Department Head, is entitled to compensation for 52.7 hours per week during the relevant time periods, for which she was only compensated for 40 hours per week.  Consequently, Gregorich was not compensated for 12.7 hours per week for 20 weeks and is entitled to the following:

### a.  May 16, 2004 through August 23, 2004

The first 6 overtime hours:

$24.65 x .5 = $12.33 x 6 hours = $73.98 x 14 weeks = $1035.72

The remaining 6.7 overtime hours:

$24.65 x 1.5 = $36.98 x 6.7 hours = $247.77 x 14 weeks = $3468.78

The total amount owed including liquidated damages:

$1035.72 + $3468.78 = $4504.50 x 1.7 = $7657.65

### b.  October 16, 2005 through November 30, 2005

The first 6 overtime hours:

$20.75 x .5 = $10.38 x 6 hours = $62.28 x 6 weeks = $373.68

The remaining 6.7 overtime hours:

$20.75 x 1.5 = $31.13 x 6.7 hours = $208.57 x 6 weeks = $1251.42

The total amount owed including liquidated damages:

$373.68 + $1251.42 = $1625.10 x 1.7 = $2762.67

### c. total amount owed to Gregorich

$7657.65 + $2762.67 = **$10420.32**

### 5. Jamie House is due $6,155.46

The parties stipulated that Jamie House may seek overtime damages for work performed from May 16, 2004 through August 23, 2004, a total of 14 workweeks, at her regular rate of pay for this time period of $16.18 per hour. The parties further stipulated that House may seek overtime damages for work performed from October 16, 2005 through November 16, 2005, a total of 4 workweeks. House's regular rate of pay during that time period is stipulated as $12.73 per hour. The Court determined that House, as a Members Activities Department Head, is entitled to compensation for 52.7 hours per week during the relevant time periods, for which she was only compensated for 40 hours per week. Therefore, House was not compensated for 12.7 hours per week for 20 weeks and is entitled to the following:

### a. May 16, 2004 through August 23, 2004

The first 6 overtime hours:

$16.18 x .5 = $8.09 x 6 hours = $48.54 x 14 weeks = $679.56

The remaining 6.7 overtime hours:

$16.18 x 1.5 = $24.27 x 6.7 hours = $162.61 x 14 weeks = $2276.54

The total amount owed including liquidated damages:

$679.56 + $2276.54 = $2956.10 x 1.7 = $5025.37

### b.  October 16, 2005 through November 16, 2005

The first 6 overtime hours:

$12.73 x .5 = $6.37 x 6 hours = $38.22 x 4 weeks = $152.88

The remaining 6.7 overtime hours:

$12.73 x 1.5 = $19.10 x 6.7 hours = $127.97 x 4 weeks = $511.88

The total amount owed including liquidated damages:

$152.88 + $511.88 = $664.76 x 1.7 = $1130.09

### c.  total amount owed to House

$5025.37 + $1130.09 = **$6155.46**

### 6.  Bridget Ipema is due $1,325.12

The parties stipulated that Bridget Ipema may seek overtime damages for work performed from October 16, 2005 through November 30, 2005, a total of 6 workweeks.  The parties further stipulated that Ipema's regular rate of pay was $14.73 per hour.  The Court determined that Ipema, as a Members Activities Department Head, is entitled to compensation for 52.7 hours per week during the relevant time period, for which she was only compensated for 40 hours per week.  The parties stipulated that Ipema took 24 hours of paid time off during the time period from November 16, 2005 through November 30, 2005, a period encompassing 2 workweeks.  Consequently, during those 2 workweeks Ipema worked .7 hours overtime each week (52.7 hours - 12 hours = .7 overtime hours per week).  Thus, Ipema was not compensated

for 12.7 hours per week for 4 weeks and .7 hours per week for 2 weeks and is entitled to the following:

### a.  12.7 hours for 4 weeks

The first 6 overtime hours:

$14.73 x .5 = $7.37 x 6 hours = $44.22 x 4 weeks = $176.88

The remaining 6.7 overtime hours:

$14.73 x 1.5 = $22.10 x 6.7 hours = $148.07 x 4 weeks = $592.28

The total amount owed including liquidated damages:

$176.88 + $592.28 = $769.16 x 1.7 = $1307.57

### b. .7 hours for 2 weeks

The first .7 overtime hours:

$14.73 x .5 = $7.37 x .7 hours = $5.16 x 2 weeks = $10.32

The total amount owed including liquidated damages:

$10.32 x 1.7 = $17.55

### c.  total amount due to Ipema

$1307.57 + $17.55 = **$1325.12**

### 7.  Robert Nutinsky is due $3,184.03

The parties stipulated that Robert Nutinsky may seek overtime damages for work performed from May 16, 2004 through August 23, 2004, a total of 14 workweeks.  The parties further stipulated that Nutinsky's regular rate of pay was $11.96 per hour.  The Court determined that Nutinsky, as a Members Activities Department Head, is entitled to compensation for 52.7 hours per week during the relevant time period, for which he was only compensated for 40 hours

per week.  The parties stipulated that Nutinsky took 30 hours paid time off during the time period from August 1, 2004 through August 15, 2004, a period encompassing 2 workweeks. Consequently, during those 2 workweeks Nutinsky did not work overtime (52.7 hours - 15 hours = 37.7 hours per week for each of these 2 workweeks).  Accordingly, Nutinsky was not compensated for 12.7 hours per week for 12 weeks and is entitled to the following:

The first 6 overtime hours:

$11.96 x .5 = $5.98 x 6 hours = $35.88 x 12 weeks = $430.56

The remaining 6.7 overtime hours:

$11.96 x 1.5 = $17.94 x 6.7 hours = $120.20 x 12 weeks = $1442.40

The total amount owed including liquidated damages:

$430.56 + $1442.40 = $1872.96 x 1.7 = **$3184.03**

### 8.  Andrea Schroeder is due $4,342.07

The parties stipulated that Andrea Schroeder may seek overtime damages for work performed from May 16, 2004 through August 23, 2004, a total of 14 workweeks.  The parties further stipulated that Schroeder's regular rate of pay was $13.98 per hour.  The Court determined that Schroeder, as a Members Activities Department Head, is entitled to compensation for 52.7 hours per week during the relevant time period, for which she was only compensated for 40 hours per week.  Thus, Schroeder was not compensated for 12.7 hours per week for 14 weeks and is entitled to the following:

The first 6 overtime hours:

$13.98 x .5 = $6.99 x 6 hours = $41.94 x 14 weeks = $587.16

The remaining 6.7 overtime hours:

$13.98 x 1.5 = $20.97 x 6.7 hours = $140.50 x 14 weeks = $1967.00

The total amount owed including liquidated damages:

$587.16 + $1967.00 = $2554.16 x 1.7 = **$4342.07**

## D.  Nontestifying Life Spa Department Heads

### 1.  Sarah Erdman is due $3,979.53

The parties stipulated that Sarah Erdman may seek overtime damages for work performed from October 16, 2005 through November 30, 2005, a total of 6 workweeks.  The parties further stipulated that Erdman's regular rate of pay was $17.34 per hour.  The Court determined that Erdman, as a Life Spa Department Head, is entitled to compensation for 59 hours per week during the relevant time period, for which she was only compensated for 40 hours per week.  Thus, Erdman was not compensated for 19 hours per week for 6 weeks and is entitled to the following:

The first 6 overtime hours:

$17.34 x .5 = $8.67 x 6 hours = $52.02 x 6 weeks = $312.12

The remaining 13 overtime hours:

$17.34 x 1.5 = $26.01 x 13 hours = $338.13 x 6 weeks = $2028.78

The total amount owed including liquidated damages:

$312.12 + $2028.78 = $2340.90 x 1.7 = **$3979.53**

### 2.  Meghan Fuss is due $4,331.63

The parties stipulated that Meghan Fuss may seek overtime damages for work performed from October 16, 2005 through November 30, 2005, a total of 6 workweeks.  The parties further

stipulated that Fuss's regular rate of pay was $18.87 per hour.  The Court determined that Fuss, as a Life Spa Department Head, is entitled to compensation for 59 hours per week during the relevant time period, for which she was only compensated for 40 hours per week.  Thus, Fuss was not compensated for 19 hours per week for 6 weeks and is entitled to the following:

The first 6 overtime hours:

$18.87 x .5 = $9.44 x 6 hours = $56.64 x 6 weeks = $339.84

The remaining 13 overtime hours:

$18.87 x 1.5 = $28.31 x 13 hours = $368.03 x 6 weeks = $2208.18

The total amount owed including liquidated damages:

$339.84 + $2208.18 = $2548.02 x 1.7 = **$4331.63**

### 3. Jacob Lloyd is due $3,408.34

The parties stipulated that Jacob Lloyd may seek overtime damages for work performed from October 16, 2005 through November 30, 2005, a total of 6 workweeks.  The parties further stipulated that Lloyd's regular rate of pay was $16.30 per hour.  The Court determined that Lloyd, as a Life Spa Department Head, is entitled to compensation for 59 hours per week during the relevant time period, for which he was only compensated for 40 hours per week.  The parties stipulated that Lloyd took 8 hours of paid time off during 1 week.  Thus, Lloyd was not compensated for 19 hours per week for 5 weeks and 11 hours for 1 week and is therefore entitled to the following:

### a. 19 hours per week for 5 weeks

The first 6 overtime hours:

$16.30 x .5 = $8.15 x 6 hours = $48.90 x 5 weeks = $244.50

The remaining 13 overtime hours:

$16.30 x 1.5 = $24.45 x 13 hours = $317.85 x 5 weeks = $1589.25

The total amount owed including liquidated damages:

$244.50 + $1589.25 = $1833.75 x 1.7 = $3117.38

### b. 11 hours per week for 1 week

The first 6 overtime hours:

$16.30 x .5 = $8.15 x 6 hours = $48.90 x 1 week = $48.90

The remaining 5 overtime hours:

$16.30 x 1.5 = $24.45 x 5 hours = $122.25 x 1 week = $122.25

The total amount owed including liquidated damages:

$48.90 + $122.25 = $171.15 x 1.7 = $290.96

### c. total amount due to Lloyd

$3117.38 + $290.96 = **$3408.34**

### 4. Elizabeth Weiler is due $4,144.77

The parties stipulated that Elizabeth Weiler may seek overtime damages for work performed from October 16, 2005 through November 30, 2005, a total of 6 workweeks. The parties further stipulated that Weiler's regular rate of pay was $18.06 per hour. The Court determined that Weiler, as a Life Spa Department Head, is entitled to compensation for 59 hours per week during the relevant time period, for which she was only compensated for 40 hours per week. Thus, Weiler was not compensated for 19 hours per week for 6 weeks and is entitled to the following:

The first 6 overtime hours:

$18.06 x .5 = $9.03 x 6 hours = $54.18 x 6 weeks = $325.08

The remaining 13 overtime hours:

$18.06 x 1.5 = $27.09 x 13 hours = $352.17 x 6 weeks = $2113.02

The total amount owed including liquidated damages:

$325.08 + $2113.02 = $2438.10 x 1.7 = **$4144.77**

**5.  Theresa West is due $6,412.23**

The parties stipulated that Theresa West may seek overtime damages for work performed

from October 16, 2005 through November 30, 2005, a total of 6 workweeks.  The parties further

stipulated that West's regular rate was $27.94 per hour.  The Court determined that West, as a

Life Spa Department Head, is entitled to compensation for 59 hours per week during the relevant

time period, for which she was only compensated for 40 hours per week.  Thus, West was not

compensated for 19 hours per week for 6 weeks and is entitled to the following:

The first 6 overtime hours:

$27.94 x .5 = $13.97 x 6 hours = $83.82 x 6 weeks = $502.92

The remaining 13 overtime hours:

$27.94 x 1.5 = $41.91 x 13 hours = $544.83 x 6 weeks = $3268.98

The total amount owed including liquidated damages:

$502.92 + $3268.98 = $3771.90 x 1.7 = **$6412.23**

### E.  Nontestifying Life Café Department Heads

#### 1.  Christopher Mann is due $5,155.08

The parties stipulated that Christopher Mann may seek overtime damages for work

performed from October 16, 2005 through November 30, 2005, a total of 6 workweeks.  The

parties further stipulated that Mann's regular rate of pay was $26.95.  The Court determined that

Mann, as a Life Café Department Head, is entitled to compensation for 56.5 hours per week

during the relevant time period, for which he was only compensated for 40 hours per week.

Thus, Mann was not compensated for 16.5 hours per week for 6 weeks and is entitled to the

following:

The first 6 overtime hours:

$26.95 x .5 = $13.48 x 6 hours = $80.88 x 6 weeks = $485.28

The remaining 10.5 overtime hours:

$26.95 x 1.5 = $40.43 x 10.5 hours = $424.52 x 6 weeks = $2547.12

The total amount owed including liquidated damages:

$485.28 + $2547.12 = $3032.40 x 1.7 = **$5155.08**

#### 2.  Angela Mendez is due $9,142.36

The parties stipulated that Angela Mendez may seek overtime damages for work

performed from May 16, 2004 through August 23, 2004, a total of 14 workweeks.  The Court

determined that Mendez, as a Life Café Department Head, is entitled to compensation for 56.5

hours per week during the relevant time period, for which she was only compensated for 40

hours per week.  The parties stipulated that Mendez took 72 hours paid time off during the time

period from August 1, 2004 through August 15, 2004, a period encompassing 2 workweeks.

81

Consequently, during those 2 workweeks Mendez did not work overtime (56.5 hours - 36 hours = 20.5 hours per week for each of these 2 workweeks). Thus, Mendez was not compensated for 16.5 hours per week for 12 weeks. The parties stipulated her regular rate of pay during this 12 week period was $15.97.

The parties also stipulated that Mendez may seek overtime damages for work performed from October 16, 2005 through November 30, 2005, a total of 6 workweeks. The Court determined that Mendez is entitled to compensation for 56.5 hours per week during this time period as well, for which she was only compensated for 40 hours per week. Therefore, Mendez was not compensated for 16.5 hours per week for 6 weeks. The parties stipulated that during this 6 week period Mendez's regular rate of pay was $15.85 per hour.

### a.  May 16, 2004 through August 23, 2004

The first 6 overtime hours:

$15.97 x .5 = $7.99 x 6 hours = $47.94 x 12 weeks = $575.28

The remaining 10.5 overtime hours:

$15.97 x 1.5 = $23.96 x 10.5 hours = $251.58 x 12 weeks = $3018.96

The total amount owed including liquidated damages:

$575.28 + $3018.96 = $3594.24 x 1.7 = $6110.21

### b.  October 16, 2005 through November 30, 2005

The first 6 overtime hours:

$15.85 x .5 = $7.93 x 6 hours = $47.58 x 6 weeks = $285.48

The remaining 10.5 overtime hours:

$15.85 x 1.5 = $23.78 x 10.5 hours = $249.69 x 6 weeks = $1498.14

82

<u>The total amount owed including liquidated damages</u>:

$285.48 + $1498.14 = $1783.62 x 1.7 = $3032.15

**c. total due Mendez**

$6110.21 + $3032.15 = **$9142.36**

### IX. Conclusion

Based on the foregoing, the Court **DIRECTS** the Clerk to **ENTER JUDGMENT** in

favor of Plaintiffs in accordance with this Opinion and Order.

**IT IS SO ORDERED.**

<u>/s/ Gregory L. Frost</u>
**GREGORY L. FROST**
**UNITED STATES DISTRICT JUDGE**